MAOHKarC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   PALANI KARUPAIYAN,

4                    Plaintiff,

5            v.                              19 Civ. 8814 (KPF)

6   CVS HEALTH CORPORATION, et
    al.,
7                                            Conference

8                    Defendants.

9   ------------------------------x
                                             New York, N.Y.
10                                           October 24, 2022
                                             3:05 p.m.
11
    Before:
12
                          HON. KATHERINE POLK FAILLA,
13
                                             District Judge
14
                              APPEARANCES
15

16  PALANI KARUPAIYAN, Pro Se Plaintiff

17  LITTLER MENDELSON, P.C.
         Attorneys for Defendant CVS
18  BY:  MARCY A. GILROY

19  JACKSON LEWIS PC
         Attorneys for Defendant APN Consulting
20  BY:  JASON A. ZOLDESSY

21

22

23

24

25

MAOHKarC

| | |
|---|---|
| 1 | (Case called) |
| 2 | MR. KARUPAIYAN:  Palani Karupaiyan, plaintiff. |
| 3 | THE COURT:  Mr. Karupaiyan, let me suggest something, |
| 4 | please, and I'll suggest it to each of you. |
| 5 | Please be seated, sir.  You're welcome to bring the |
| 6 | microphone closer to you, and because you're using a mask, the |
| 7 | acoustics in this courtroom are not great, for those of you |
| 8 | using masks, just bring the microphone close to you. |
| 9 | All right, sir.  Are you able hear me? |
| 10 | MR. KARUPAIYAN:  Yeah, I hear you. |
| 11 | THE COURT:  And I can hear you now.  Thank you very |
| 12 | much. |
| 13 | Mr. Zoldessy. |
| 14 | MR. ZOLDESSY:  Good afternoon, your Honor.  Jason |
| 15 | Zoldessy from Jackson Lewis P.C.  We're counsel for the APN |
| 16 | defendants in this case. |
| 17 | THE COURT:  Thank you very much, and good afternoon. |
| 18 | MS. GILROY:  Good afternoon, your Honor.  Marcy |
| 19 | Gilroy, Littler Mendelson, on behalf of CVS defendants. |
| 20 | THE COURT:  Thank you very much, and good afternoon to |
| 21 | you. |
| 22 | This is our post-fact discovery conference, so I |
| 23 | wanted to begin by making sure fact discovery had concluded. |
| 24 | Mr. Karupaiyan, have you received the documents or the |
| 25 | materials that you requested from the defendants?  Well, I |

MAOHKarC

1    should ask a better question.

2            Sir, did you request any documents from anyone at the

3    back table?  Did you request materials about your case?

4            MR. KARUPAIYAN:  I requested several set of material,

5    and they said they will answer me in a month or maybe another

6    month.  They said they will reply me back.

7            THE COURT:  I'm sorry.  There were things you

8    requested that they'll give you in a month or so?

9            MR. KARUPAIYAN:  I requested in September 18.  Then

10   recently, a week ago, I got reply from them.  They need

11   additional 30 days.

12           THE COURT:  Hold on.  I think I'm understanding

13   something different.

14           They've asked you for materials, and you will be

15   giving them things?

16           MR. KARUPAIYAN:  No, I asked for them to give it to

17   me.

18           THE COURT:  All right.  Mr. Zoldessy, may I hear from

19   you on the issue of discovery.

20           MR. ZOLDESSY:  Sure.  Yes, your Honor.

21           So both parties -- what I believe Mr. Karupaiyan's

22   referring to is that after the close of fact discovery,

23   Mr. Karupaiyan sent us some materials, and included in those

24   were what he phrases second sets of interrogatories to

25   defendants.  There was one set to my clients and one set to

1    Ms. Gilroy's clients.  A few days after that Mr. Karupaiyan

2    sent us an email that he was going to be writing to the Court

3    seeking leave to serve additional interrogatories or additional

4    discovery requests beyond that provided by the Federal Rules of

5    Civil Procedure, and he indicated that he was unable to conduct

6    depositions of defendants.  We wrote back to him seeking

7    clarification as to whether he was referring to the

8    interrogatories that he had sent us prior, whether he was

9    seeking to serve additional discovery requests that he had not

10   yet served.

11        This came up again, I guess, at some point last week

12   when Mr. Karupaiyan reached out to us about his discovery

13   requests, and we pointed out that we hadn't heard from him

14   about what he was seeking to serve or what he was looking for

15   from us.  But we did indicate that if it was acceptable to the

16   Court and if there would be no other discovery requests that

17   he'd be seeking to serve or depositions he'd be seeking to

18   conduct, that we could provide responses to these supplemental

19   requests that he served at the end of discovery within 30 days

20   of that email that I responded to late last week.

21        THE COURT:  And was there a response to that offer?

22        MR. ZOLDESSY:  We did not hear from Mr. Karupaiyan

23   after that.

24        THE COURT:  Just one moment, please, sir.  I'm going

25   to speak to you in a moment.  I want to understand what

1    Mr. Zoldessy said, and then I'll come back to you.

2           Mr. Zoldessy, in your submission to me, you indicated

3    that there were outstanding requests that you had of

4    Mr. Karupaiyan.  Did you receive those materials?

5           MR. ZOLDESSY:  We did, your Honor.

6           THE COURT:  OK.

7           MR. ZOLDESSY:  I can't speak for Ms. Gilroy, but

8    Mr. Karupaiyan did send us a bunch of materials subsequent to

9    the letter that Ms. Gilroy filed on September 15 on behalf of

10   all defendants.

11          THE COURT:  OK.  Yes.  Thank you.

12          Then those materials that you received after

13   Ms. Gilroy's letter included, among the materials, actual

14   requests or interrogatories or requests for production of

15   documents, or did they simply make reference to new ones

16   coming?

17          MR. ZOLDESSY:  They included both documents from

18   Mr. Karupaiyan as well as supplemental interrogatories to

19   defendants.  I don't believe there were any supplemental

20   document requests.  I believe it was just interrogatories.

21          MS. GILROY:  There were not.

22          THE COURT:  Then there was a later indication by email

23   that Mr. Karupaiyan might seek leave of the Court to file

24   either additional interrogatories or additional requests for

25   production of documents or requests to take depositions.

1          MR. ZOLDESSY:  The first part of that is accurate.  I

2     believe his email was indicating that he was unable to take

3     depositions.  So he was never -- that was not part of it, but

4     my understanding was that these requests which he was seeking

5     to serve would be in lieu of depositions.

6          THE COURT:  OK.  I do appreciate that.

7          MS. GILROY:  Where we weren't clear simply is were the

8     ones that we received of the ones he intended in lieu of

9     deposition, or were there additional requests that he had that

10    would be forthcoming?

11         THE COURT:  All right.  Am I correct, I thought there

12    was a Ms. Simonova that entered a limited appearance for

13    Mr. Karupaiyan?  Was she involved with discovery?

14         MR. ZOLDESSY:  Her appearance -- was that question for

15    me?

16         THE COURT:  Anybody who will answer the question.  I'm

17    sorry, Mr. Zoldessy, and then I'll talk to Mr. Karupaiyan

18    because we have a lot to talk about.

19         MR. ZOLDESSY:  She appeared for both days of

20    plaintiff's deposition, made it very clear to us that her

21    involvement was limited to plaintiff's deposition, and then I

22    believe she filed with the Court once the deposition was done

23    that her service had been completed for the case.

24         THE COURT:  Yes.

25         MR. ZOLDESSY:  There's something on PACER from

1  probably early September or so.

2       THE COURT:  That's what I'm seeing, yes.  Thank you.

3       All right.  Mr. Zoldessy, before I return to

4  Mr. Karupaiyan, is there anything that you believe you are owed

5  from him that I can order the production of?  There may be

6  things that just don't exist.

7       MR. ZOLDESSY:  Again, I defer to Ms. Gilroy for her

8  position, but I think at this point we probably have from

9  Mr. Karupaiyan anything responsive that would be in existence.

10  There's no specific requests that we have of him that are

11  outstanding.

12       THE COURT:  Thank you.

13       Ms. Gilroy, I'm going to ask you to hold for a moment.

14  I do want to talk to Mr. Karupaiyan.

15       Mr. Karupaiyan, you were listening to me speak with

16  Mr. Zoldessy.  Is it correct, sir, that you included some

17  interrogatories with your production of documents?

18       MR. KARUPAIYAN:  I did request from them some

19  additional documents.

20       THE COURT:  Wait.  Did you give him originals of those

21  documents or copies?

22       MR. KARUPAIYAN:  I sent the first the set of

23  interrogatories and production of documents.  They respond to

24  me, and then during the deposition -- I was not able to take

25  deposition, so I -- I requested a second set of interrogatories

1    and second set of production of documents.

2            THE COURT:  All right.  Now, sir, so your deposition

3    was taken.  Were any other depositions taken during discovery,

4    sir?

5            MR. KARUPAIYAN:  They took me, the APN defendant took

6    the deposition, and the CVS defendant took the deposition.  I

7    was not able to conduct the deposition.

8            THE COURT:  Did you ask at any time of the defense

9    counsel for -- to schedule a deposition of anyone?  Did you

10   ever ask someone?

11           MR. KARUPAIYAN:  I'm not able to do so.  I do not ask

12   them.

13           THE COURT:  All right.  Is Mr. Zoldessy correct in

14   understanding that there are certain written discovery requests

15   that you would serve -- or that you would hope to serve or ask

16   to serve instead of having a deposition of someone?

17           MR. KARUPAIYAN:  I -- I did.  They said they will take

18   another 30 days to respond me.  Last week they reply.

19           THE COURT:  But what I believe Mr. Zoldessy said is

20   that he and Ms. Gilroy would be able to respond to your

21   requests in 30 days, assuming that those requests would be the

22   end of your discovery.  Is that correct?

23           MR. KARUPAIYAN:  Yes, yes.  Yes, yes.

24           THE COURT:  Yes.  Have you given to Mr. Zoldessy and

25   to Ms. Gilroy all of the questions -- or anything that you

MAOHKarC

1  wanted, the interrogatories and the document requests,

2  everything that you wanted answers for, you've given to them?

3         MR. KARUPAIYAN:  Yes, yes, my best.  I was not well at

4  that time.  I prefer the request.  I was suffering from the

5  COVID.

6         THE COURT:  Yes.

7         MR. KARUPAIYAN:  So I put my best effort to prepare

8  the questions in the place of deposition I send them.

9         THE COURT:  So, no, I appreciate it.  I'm sure you put

10  your best effort into these requests, sir.

11         So I will understand and defense counsel will

12  understand that you would like the answers to those requests

13  that you've made of them in the next 30 days, and then that

14  will satisfy the discovery that you were seeking from them.

15         MR. KARUPAIYAN:  Yes, yes, yes.

16         THE COURT:  OK.  I now understand that.  Thank you.

17         Ms. Gilroy, do you want to follow on?  You don't need

18  to repeat what Mr. Zoldessy has said to the extent that the

19  same thing is true for your client.

20         MS. GILROY:  Sure.

21         THE COURT:  But I would be happy to hear about

22  anything else you would like me to know.

23         MS. GILROY:  I don't -- the only thing I think needs

24  follow up is I don't think we got any document requests from

25  Mr. Karupaiyan in the second -- in the most recent discovery.

1  It was simply interrogatories that were served on September 18.

2            THE COURT:  It's my mistake for saying document

3  production requests.  I was hearing that.

4            All right.  Mr. Karupaiyan, the discovery requests

5  that you wanted to give to the defendants, you have in fact

6  given to the defendants, correct?

7            MR. KARUPAIYAN:  Yes, yes.

8            THE COURT:  Yes.  Great.  Then I assume you both have

9  the same requests, but perhaps I'm mistaken.

10           Ms. Gilroy, do you have different?

11           MS. GILROY:  Yes, Mr. --

12           THE COURT:  There are requests that are specific to

13 your client and requests that are specific to Ms. Gilroy's

14 client?

15           MS. GILROY:  Yes, your Honor, that's correct.

16           THE COURT:  May I understand, Ms. Gilroy, that you

17 will answer those interrogatories in the next 30 days?

18           MS. GILROY:  Yes, your Honor.

19           THE COURT:  OK.  And, Ms. Gilroy, otherwise do you

20 have the materials that you expected to receive from

21 Mr. Karupaiyan in discovery?

22           MS. GILROY:  Yes, your Honor, at this point I believe

23 we do.  Mr. Karupaiyan provided additional documents following

24 the deposition and --

25           THE COURT:  I'll ask you to slow down just so I can

1   take notes.

2           MS. GILROY:  Apologies.  He provided additional

3   documents following his deposition, and those were sent on the

4   18th of September with these discovery requests.  So we do have

5   those.

6           THE COURT:  As I read in the parties' submissions to

7   me, no one at this time is seeking expert discovery.  You have

8   no expert?

9           MR. KARUPAIYAN:  I don't.  No, Judge, it's not

10  affordable for me.

11          THE COURT:  No, that's fine.

12          Mr. Zoldessy, no experts, sir?

13          MR. ZOLDESSY:  No experts, your Honor.

14          THE COURT:  Thank you.

15          Ms. Gilroy?

16          MS. GILROY:  No, your Honor, no experts.

17          THE COURT:  So my expectation is in, let's say, the

18  end of November, I'm expecting that discovery's going to be

19  complete.  You will have turned over the materials that -- the

20  responses to the interrogatories.  So then the question becomes

21  what happens next?

22          Mr. Zoldessy, I thought I understood from Ms. Gilroy's

23  letter that the parties -- that the defendants were interested

24  in a motion for summary judgment.  Is that correct?

25          MR. ZOLDESSY:  That is correct, your Honor.

1          THE COURT:  Now, I know -- I believe there was a

2     settlement conference before Judge Aaron, and I believe that it

3     did not succeed, and there's nothing to suggest that further

4     settlement discussions at this time would make sense.  So I

5     guess the next thing to do is a summary judgment motion if the

6     parties wish to do it.

7          Again, Mr. Zoldessy, only because you're at my left

8     and Ms. Gilroy's at my right, I'll hear from you, unless you'd

9     rather she speak first on the issue of summary judgment

10    practice.

11         MR. ZOLDESSY:  I'm happy to lead off, your Honor.

12         THE COURT:  Go ahead.  All right.

13         MR. ZOLDESSY:  Yes, I think that the submission on

14    behalf of all defendants in our joint letter last month kind of

15    had the general terms the grounds for the summary judgment

16    motion.

17         We believe that, number one, it's discovery and

18    deposition of plaintiff has made apparent Mr. Karupaiyan was

19    not an employee of any of the defendants.  Moreover, to the

20    extent that he was a contractor or even if he was found to be

21    an employee, we don't believe that there's any basis for

22    Mr. Karupaiyan's claims of discrimination, harassment, and

23    retaliation.  There's a few facts that Mr. Karupaiyan brought

24    up and repeated throughout his deposition to support his

25    claims, but it would be defendant's position that, even if

MAOHKarC

1    credited for purposes of a motion, that that would still be

2    insufficient as a matter of law to state viable claims of

3    harassment, discrimination, and retaliation.

4              There's also the --

5              THE COURT:  I'm going to ask you to pause for just a

6    second, please, sir.

7              Let me make sure we both understand what the claims

8    are that survive.  There's a race discrimination claim under

9    Title VII.  There's a race discrimination claim under

10   Section 1981.  There's a race discrimination claim under the

11   state and city human rights laws.  There's an age

12   discrimination claim.  There's a failure to accommodate claim.

13   There is a hostile work environment claim, and there are

14   wage-and-hour claims.  All of those, you believe, are resolved

15   because of Mr. Karupaiyan's status as an employee or not

16   employee of both of your clients'?

17             MR. ZOLDESSY:  Your Honor, I would acknowledge that,

18   at a minimum, under the New York State Human Rights Law, you

19   can state a viable claim even if you are an independent

20   contractor or some other nonemployee status, but it would be

21   defendants' position that even if that were the case, that

22   Mr. Karupaiyan could still not proceed on his claims.

23             THE COURT:  That's what I'd like to understand a

24   little bit better, right.  Is your thought, sir -- and I'll

25   explain to Mr. Karupaiyan in just a moment -- is your thought

1    that, ultimately, you're asking me not to exercise jurisdiction

2    over those state and city claims, or is it that I can and

3    should address them on the merits and that they would not

4    succeed on the merits?

5           MR. ZOLDESSY:  That they would not succeed on the

6    merits.

7           THE COURT:  Because he's not an employee?

8           MR. ZOLDESSY:  For the purposes of the City Human

9    Rights Law, there's a broader definition under the City Human

10   Rights Law.

11          THE COURT:  Right.

12          MR. ZOLDESSY:  I understand that even if

13   Mr. Karupaiyan -- the Court found he was not an employee -- our

14   first argument would be he was not an employee.  Even if we

15   were to lose on that argument and the Court were to find that

16   Mr. Karupaiyan was an employee of some or all of the

17   defendants, that nevertheless he cannot state a viable claim of

18   discrimination, retaliation, or harassment under the New York

19   City Human Rights Law.

20          THE COURT:  What about the battery claim?

21          MR. ZOLDESSY:  The battery claim, your Honor, I'm not

22   sure there's a summary judgment argument to be made on that.

23   That might be one where we have to -- we defer to the Court as

24   to whether or not to maintain jurisdiction over that.  I can't

25   say we've exhaustively researched it or that I've exhaustively

1    conferred with Ms. Gilroy over it, though I do recognize that

2    there appears that there could be this factual dispute from

3    Mr. Karupaiyan's testimony that he relies upon to support the

4    battery claim.

5           THE COURT:  I understand that.

6           To be clear -- Mr. Karupaiyan, I'm going to explain

7    this to you as well -- part of the reason I have discussions

8    like this, and we had this in connection with the motion to

9    dismiss, is I'd like to get a sense of what the arguments are

10   in the motion, and if I think that they are not going to

11   succeed, I might want to tell you not to bring them.

12          But I guess, Mr. Zoldessy, I do understand the

13   arguments that you're making.

14          All right.  What else should I know, sir?  And then

15   I'll turn to -- Ms. Gilroy, hopefully.  Do you have -- off the

16   record.

17          (Discussion off the record)

18          THE COURT:  All right.  Then, Ms. Gilroy, may I hear

19   from you, please, about the summary judgment arguments.  And

20   you've just heard my discussion with Mr. Zoldessy.  Are you

21   agreeing?

22          MS. GILROY:  I am, your Honor.  I don't believe

23   there's anything -- anything really further here than what we

24   saw in our motions to dismiss.  And so given the higher

25   standards of proving his claims, I don't believe that

1  Mr. Karupaiyan will be able to meet those higher standards, be

2  able to sustain his burden on summary judgment on the vast

3  majority of his claims.  So I agree with Mr. Zoldessy.

4       THE COURT:  What do you believe -- and I'm not saying

5  I'm going to agree with you ultimately -- but what do you

6  believe discovery has shown about Mr. Karupaiyan's employment

7  status?  Who is his employer?

8       MS. GILROY:  Karupaiyan Consulting.

9       THE COURT:  I'll be right there with you, sir.  They

10 are the ones who want to make the motion, so I want to talk to

11 them first, and then I'm talking to you.  Thank you.

12      All right.  So Karupaiyan consulting, is that a

13 one-man business?  Are there others who are involved in it?

14      MS. GILROY:  According to what we've learned in

15 discovery, Karupaiyan Consulting Inc. was a company that was

16 incorporated by Mr. Karupaiyan's sister, and Mr. Karupaiyan was

17 the sole employee.

18      THE COURT:  Ms. Gilroy, you heard me speaking to

19 Mr. Zoldessy about the battery claim and about the City Human

20 Rights Law claim, which I think has a different standard.  Why,

21 if you do believe that these claims will also be amenable to

22 disposition on summary judgment, do you believe that?

23      MS. GILROY:  So I agree with Mr. Zoldessy that even on

24 a lower standard for the city claims and the state claims, I

25 don't believe Mr. Karupaiyan has adduced sufficient evidence to

1  surpass those standards.  I do think we probably have -- I do

2  also agree with Mr. Zoldessy that the battery claim may have a

3  closer issue, and we haven't really discussed that extensively.

4  That may be, in fact, a question of fact, which then the

5  question remains whether the Court retains that claim for

6  adjudication.

7           THE COURT:  Yes.  We'll see what you're asking me to

8  do when the motion is otherwise filed.

9           Mr. Zoldessy has been before me enough times to know

10 that I always ask this question.  Are you hell-bent on filing

11 this motion?

12          MS. GILROY:  I think filing the motion makes the most

13 sense from the perspective of the finality and resolution of

14 the case.

15          THE COURT:  All right.  Mr. Zoldessy, the same

16 question?

17          MR. ZOLDESSY:  I agree, your Honor.

18          THE COURT:  All right.  That's a "yes" to my question?

19          MR. ZOLDESSY:  Yes, your Honor.

20          THE COURT:  That's fine.

21          Mr. Karupaiyan, I don't know that you and I have

22 spoken about summary judgment motions.  We may have early on in

23 the case, but what summary judgment motions are is when the

24 moving party, in this case the defendants, say that based on

25 everything that was produced in discovery, they believe that

MAOHKarC

1   your claim should not go to a jury trial.  They believe that

2   your claim can be resolved short of a jury trial.

3            So what they've said to me, in particular, is that the

4   evidence in this case suggests that you were employed by an

5   entity called Karupaiyan Consulting, and they think that as a

6   result of that you wouldn't be their employee, you'd be an

7   employee of Karupaiyan Consulting, and that that might have

8   some impact on the employment claims that you bring.

9            I'm not going to ask you about the battery claim, sir,

10  because I don't really think that's something that's going to

11  be resolved in summary judgment.  But let me ask you this:  Is

12  there an entity called Karupaiyan Consulting?  Just is that an

13  actual business that exists somewhere in the world?

14           MR. KARUPAIYAN:  Yes.

15           THE COURT:  Yes.  Is that a business that was formed

16  by your sister, sir?

17           MR. KARUPAIYAN:  Yes, sir -- yes, ma'am.

18           THE COURT:  Were you ever employed by Karupaiyan

19  Consulting?

20           MR. KARUPAIYAN:  I'm independent employee.

21           THE COURT:  You were what, please, sir?

22           MR. KARUPAIYAN:  Independent contractor, independent

23  employee.

24           THE COURT:  A limited employee?

25           MR. KARUPAIYAN:  Independent.

MAOHKarC

1          THE COURT:  Independent employee.  I beg your pardon.

2     Excuse me, sir.  Sorry.  I told you the acoustics in the

3     courtroom are quite poor.

4          So you were an independent contractor, yes?

5          MR. KARUPAIYAN:  Yes.

6          THE COURT:  So did Karupaiyan Consulting -- did you

7     ever sign any agreements with them?

8          MR. KARUPAIYAN:  No, ma'am.

9          THE COURT:  No.  Did you perform services for

10    Karupaiyan Consulting?

11         MR. KARUPAIYAN:  My service provided to this

12    defendants.

13         THE COURT:  Services provided to these defendants.

14         MR. KARUPAIYAN:  (Nods head.)

15         THE COURT:  I see.

16         MR. KARUPAIYAN:  The service contract says I'm

17    independent contractor.  The service contract I provided by

18    APN, it says I am independent contractor.

19         THE COURT:  It stated that you were an independent

20    contractor.  OK.  That's interesting, because to me an

21    independent contractor is something that one distinguishes from

22    being an employee.

23         So you're saying, sir, that you were an independent --

24    you said to me earlier you were an independent employee.  If I

25    use the term "independent contractor," does that mean the same

MAOHKarC

1  thing to you?

2          MR. KARUPAIYAN:  Sorry.  I don't understand.  Ask the

3  question again.

4          THE COURT:  Of course.  I'll even step back a few

5  paces.

6          You've said to me you were not an employee of

7  Karupaiyan Consulting, is that correct?

8          MR. KARUPAIYAN:  Yes, I'm independent.

9          THE COURT:  You're independent, meaning you work for

10  yourself?

11          MR. KARUPAIYAN:  Yes.

12          THE COURT:  Why I'm asking that question is that

13  sometimes there's a distinction made between people who are

14  employees of a particular company and people who are

15  independent contractors, which may be what you're saying when

16  you refer to yourself as an independent employee.

17          When I hear that term, what that means to me is that

18  that person is sort of working for themselves, working for

19  their own business entity.

20          Did you work for yourself, sir?

21          MR. KARUPAIYAN:  Judge, to work independent, there is

22  no need of a business.  For example, people work independent,

23  they receive 1099.

24          THE COURT:  OK.  But when you were working -- was it

25  your view, sir, that as an independent employee, when you went

MAOHKarC

1  to work for a company, you became an employee of that company?

2      MR. KARUPAIYAN:  If I'm employee, I should be paid in

3  W-2.

4      THE COURT:  OK.  Now we're with the W-2.  OK.

5      MR. KARUPAIYAN:  If the company provide me any

6  benefit, it should be available to me.

7      THE COURT:  All right.  But --

8      MR. KARUPAIYAN:  Those are the things that didn't

9  happen in the Karupaiyan Consulting.

10      THE COURT:  When --

11      MR. KARUPAIYAN:  I was not paid at all for Karupaiyan

12  Consulting for the service provided by me.

13      THE COURT:  I'm sorry, sir.  I apologize.  I'm not

14  able to hear you.  I'm going to ask you to speak a little

15  slower and a little bit louder.  Thank you.

16      MR. KARUPAIYAN:  Karupaiyan Consulting did not pay me

17  at all.  Did not give me any benefit at all.  So I am

18  independent employee to the Karupaiyan Consulting, and this is

19  different than them too.  Also for the defendant I am

20  independent contractor.

21      THE COURT:  OK.  Hang on a second.  I think I

22  understand what you're saying.  But you weren't paid, and that

23  was part of the whole reason why this complaint was brought,

24  because you weren't paid for the work that you did.

25      Was the idea that the payments were going to be made

MAOHKarC

1    by CVS or by APN -- well, who was going to?  Was CVS going to

2    pay APN and APN was going to pay you?  Was that the way it was

3    going to work?

4            MR. KARUPAIYAN:  APN is going to pay Karupaiyan

5    Consulting.  Karupaiyan Consulting going to pay me.

6            THE COURT:  Right.

7            MR. KARUPAIYAN:  So APN did not pay me at all.

8    Karupaiyan Consulting -- Karupaiyan Consulting did not pay me.

9            THE COURT:  OK. If everything had worked out as it was

10   supposed to, Karupaiyan Consulting was going pay you?

11           MR. KARUPAIYAN:  Yeah, Karupaiyan Consulting going to

12   pay me, but it pay me 1099.

13           THE COURT:  Whether it was 1099 or a W-2, I

14   understand.

15           MR. KARUPAIYAN:  I'm independent contractor, yeah,

16   independent employee.

17           THE COURT:  You were an independent contractor or an

18   independent employee, but you were expecting when you started

19   that you were going to receive money somehow --

20           MR. KARUPAIYAN:  Yes.

21           THE COURT:  -- from Karupaiyan Consulting, yes?

22           MR. KARUPAIYAN:  Yes.

23           THE COURT:  Yes.  And what was going to happen was CVS

24   was going to pay APN, yes?

25           MR. KARUPAIYAN:  Yes.

1          THE COURT:  APN was going to pay Karupaiyan

2     Consulting, also yes?

3          MR. KARUPAIYAN:  Yes.

4          THE COURT:  Karupaiyan Consulting was going to pay

5     you?

6          MR. KARUPAIYAN:  Yeah.

7          THE COURT:  OK.  I understand that.

8          But your problem is that you didn't get paid by

9     anybody.  You didn't get paid by CVS or by APN or by Karupaiyan

10    Consulting or by anybody for the work that you did?

11         MR. KARUPAIYAN:  Yes.

12         THE COURT:  OK.  I understand that.

13         Now, just to go back to my -- a few moments ago, the

14    way this was supposed to work is that Karupaiyan Consulting was

15    going to pay you.  Was there an agreement that either

16    Karupaiyan Consulting had with APN for your payment -- for

17    payment or that you had with Karupaiyan Consulting?

18         You just told me how the money was supposed to flow.

19    Was there a document or documents that set forth how the

20    payments were going to be paid?

21         MR. KARUPAIYAN:  Between Karupaiyan Consulting and me,

22    there is no document.  There is a document between Karupaiyan

23    Consulting and the APN.  It says I'm an independent contractor.

24         THE COURT:  Got it.  I do understand that.  Thank you.

25         I don't want to put words in your mouth, sir, but let

MAOHKarC

1    me just ask this question:  Is it your view that because you

2    didn't get paid at all, that you have a right as against APN

3    for the nonpayment of money and as against CVS for the

4    nonpayment of money because somebody should have paid you, is

5    that fair?

6              MR. KARUPAIYAN:  That's right, Judge.  I'm -- similar

7    thing in the past happened.  One of my employer did not pay me.

8    So the one employer above me in the chain, contracting chain,

9    they pay me directly.  I was working in the Tyson Food.

10             THE COURT:  Hold on.  Going to ask you to just slow

11   down and repeat yourself again.  Thank you, sir.

12             MR. KARUPAIYAN:  I was working at the Tyson Food in

13   Arkansas.  The contractor hold my work permit visa, he run out

14   of business.  So the Tyson Food directly make arrange -- pay

15   the payment arrangement to me.  Somebody in the middle of --

16   middle of the contractor chain went out of business.  I have to

17   be paid.  The Karupaiyan Consulting is not in the business

18   right now.  The APN need to pay me or CVS needs to pay me.

19             THE COURT:  Now, there were discussions -- and I'm

20   going to ask the folks at the back table about those in just a

21   moment just a minute -- about whether there is money owed to

22   you.

23             So Karupaiyan Consulting is your sister's company, is

24   that correct?

25             MR. KARUPAIYAN:  Yes, yes.

MAOHKarC

1          THE COURT:  OK.  And is it fair -- again, if you'd

2     prefer not to answer it, just say that you don't want to answer

3     it -- is it fair to say that at some point in your work for

4     CVS, your work for them, that you asked your sister, hey, has

5     anybody paid me anything?  And is it fair to say your sister

6     told you no payments ever came in for the work that you did?

7          MR. KARUPAIYAN:  Yes, no money come.

8          THE COURT:  All right.  Thank you.

9          Mr. Zoldessy, I thought in the letter -- and perhaps

10    if this is better handled by Ms. Gilroy, you'll let me know --

11    but there was discussion about -- I believe there was

12    discussion of Mr. Karupaiyan's letter about attempts to pay him

13    the outstanding wages.

14          Would one of you, the one of you who has more

15    knowledge of this, speak to me, please, about what was supposed

16    to happen in your estimation.  He's just told me what he

17    thought was going to happen.  I want to hear from you what you

18    thought was going to happen and why he didn't get paid.

19          MR. ZOLDESSY:  I think it's probably best directed to

20    me, your Honor.

21          THE COURT:  Go ahead, Mr. Zoldessy.

22          MR. ZOLDESSY:  Your Honor, I agree with

23    Mr. Karupaiyan's description of what the chain of payment was

24    supposed to be.  I guess the one caveat is that I'm not sure

25    what arrangement Mr. Karupaiyan might have had with Karupaiyan

1    Consulting, but APN's agreement was with Karupaiyan Consulting,

2    which provided for payment by APN to Karupaiyan Consulting.

3           And this came up, I believe, during a prior

4    conference, but the issue was that during the summer of 2019

5    when this was occurring, APN had sent checks for the invoices

6    provided by Karupaiyan Consulting, at least for the first

7    couple of invoices provided, for the stated amounts, and they

8    were being returned to APN consulting as undeliverable.

9           We had produced a copy in discovery of some of these

10   envelopes which were returned by the post office as being

11   undeliverable, and APN had reached out at the time to

12   Mr. Karupaiyan attempting to get a new forwarding address for

13   him, because that was an ongoing issue as far as we're --

14   trying to figure out where to send things to him for, and there

15   was never a clear answer provided.

16          I know that Mr. Karupaiyan's preference was to be paid

17   by direct deposit or some sort of electronic payment at the

18   time, which was not something that was offered.  There was also

19   an issue at the time that there were a couple of invoices --

20          THE COURT:  Please stop a moment, please.  APN did not

21   offer direct deposit payment?

22          MR. ZOLDESSY:  Back in 2019, my understanding is

23   that's correct, they were not paying anyone by direct deposit.

24          THE COURT:  I see.

25          MR. ZOLDESSY:  But they were making an effort to

1    provide checks to Mr. Karupaiyan, and also I believe there were

2    a couple of invoices or a couple of time sheets for invoices

3    that they were trying to obtain from him.

4          But skipping ahead, there's no dispute that

5    Mr. Karupaiyan -- or Karupaiyan Consulting, rather, never

6    cashed checks from APN. There were efforts made to find out

7    how to get payment to them.

8          THE COURT: Just pause a moment again, please, sir.

9          They never cashed, but some of those -- obviously,

10    they couldn't cash a check that had been returned as not

11    deliverable. Were there any checks that were delivered?

12          MR. ZOLDESSY: I don't believe that there were.

13          THE COURT: So it's not a shock that they didn't cash

14    any checks, because they didn't get any checks to cash.

15          OK. What I'm hearing you say, and what hopefully the

16    evidence is going to support, because I'll be sad if I'm being

17    lied to, is that there were efforts made to work this out

18    because these checks, they kept getting returned, and there was

19    a recognition that Mr. Karupaiyan or Karupaiyan Consulting was

20    owed money?

21          MR. ZOLDESSY: Correct, your Honor.

22          THE COURT: OK.

23          MR. ZOLDESSY: I know earlier on in the case also we

24    had tried to get current mailing addresses from Mr. Karupaiyan.

25    It was a struggle for us. I think it was a struggle for the

1  Court.  Candidly, regarding this issue, I guess there was

2  probably no discussion about it for a while until

3  plaintiff's deposition was approaching, until we had

4  discussions with my client that, look, we're going to be seeing

5  Mr. Karupaiyan.  We want to have a check for him to put this

6  issue to bed once and for all?

7          My client provided -- overnighted to me a check made

8  payable to Karupaiyan Consulting for what I believe is the

9  undisputed amount which was owed to Karupaiyan Consulting for

10  any of the services provided.  We had that check available at

11  Mr. Karupaiyan's deposition.  We spoke with his attorney at the

12  deposition about this, encouraging Mr. Karupaiyan to take it.

13  At first there was some resistance from Mr. Karupaiyan that

14  he'd be compromising claims or releasing some, and we put on

15  the record, look, this is being offered to you no strings

16  attached.  We're not asking you to waive, release anything.

17  Nothing's changing with the claims here you're asserting in

18  court.  We're not asking you to sign any paperwork for it.

19  Here's the check, Mr. Karupaiyan.  Please take it.

20          And we spoke off the record with his attorney as well

21  about it, and I think at one point there was an agreement that

22  morning while we were on the record that Mr. Karupaiyan was

23  taking the check and that would resolve this issue.

24  Unfortunately, we got back from the lunch break during the

25  deposition, and Mr. Karupaiyan's attorney approached Ms. Gilroy

1    and I, approached and said that Mr. Karupaiyan was unwilling to

2    take the check after all because he was concerned that he

3    wouldn't be able to do anything with it because Karupaiyan

4    Consulting no longer exists or no longer maintains a bank

5    account, and he would not be able to cash it.

6         THE COURT:  It is in the name of Karupaiyan

7    Consulting, and at this time there was not an offer made to put

8    it in his name or to give it to him in cash or to give it to

9    him in -- right, I understand that.

10        MR. ZOLDESSY:  That's correct.

11        THE COURT:  And that's where things stood.

12        MR. ZOLDESSY:  I guess the way we -- the last

13   discussion at the deposition, we said we would confer with --

14   withdrawn.  Let me start over.

15        THE COURT:  Thank you.

16        MR. ZOLDESSY:  Mr. Karupaiyan did make the request

17   that the check be made payable to him individually, and we had

18   said we would confer about that, we would speak with his

19   attorney.  I had discussions with Ms. Gilroy after the

20   deposition, and I think there was a mutual decision that was

21   made, especially given that Mr. Karupaiyan represented during

22   his deposition that it was his sister who was really the

23   principal and rightful payee perhaps on behalf of Karupaiyan

24   Consulting that we were hesitant to just send a check or direct

25   deposit or ACH money to Mr. Karupaiyan individually out of

MAOHKarC

1  concern that that would turn out to not actually resolve claims

2  brought by Mr. Karupaiyan for moneys allegedly owed to

3  Karupaiyan Consulting.

4          Taking this one step further, your Honor, to the

5  extent this changes anything, if Mr. Karupaiyan has

6  reconsidered, I still have the check right with me.  If

7  Karupaiyan Consulting is able to accept a check or, in the

8  alternative, with the proper representations on the record and

9  with your Honor's assistance, if Mr. Karupaiyan is able to

10  represent that he's authorized to receive this money on behalf

11  of Karupaiyan Consulting and that this will resolve this issue,

12  my client -- I spoke with him Friday afternoon -- will expedite

13  a check to Mr. Karupaiyan this week made payable to him

14  individually.  It's just we were concerned about doing this

15  outside of court out of fear that this issue would still come

16  back that we never actually paid Mr. Karupaiyan -- that we

17  never paid Karupaiyan Consulting as per the contractor

18  agreement.

19          THE COURT:  Understood.  Thank you.

20          Mr. Karupaiyan, to the best of your knowledge, does

21  Karupaiyan Consulting today exist as a company?

22          MR. KARUPAIYAN:  No, ma'am, it's closed.

23          THE COURT:  They are closed.

24          And they no longer have any bank accounts?

25          MR. KARUPAIYAN:  No, no longer has bank accounts.  No

1    more in the business.

2              THE COURT:  They have nothing?

3              MR. KARUPAIYAN:  (Shakes head.)

4              THE COURT:  All right.  Does your sister have a

5    different business?

6              MR. KARUPAIYAN:  No.

7              THE COURT:  You've just heard me speaking with

8    Mr. Zoldessy right now.  He has a check made out to Karupaiyan

9    Consulting, but you're telling me that's not useful because

10   there is no one who can deposit that check?

11             MR. KARUPAIYAN:  That's right.

12             THE COURT:  All right.

13             MS. GILROY:  If I might, your Honor?

14             THE COURT:  Please, Ms. Gilroy.

15             MS. GILROY:  Karupaiyan Consulting still does exist as

16   a viable entity, at least from the state of New Jersey's

17   perspective.  It is a registered entity.  It has not been -- it

18   has not been dissolved in accordance with state law, so it

19   still exists under the state of New Jersey's -- from the state

20   of New Jersey's perspective.  No paperwork has been filed,

21   however, for several years.  So that was part of the concern

22   Mr. Zoldessy and I had about paying Mr. Karupaiyan when the

23   entity still does exist.

24             THE COURT:  You're not disputing if he represents to

25   us --

1         MS. GILROY: Correct.

2         THE COURT: -- it's not doing any business and there

3 isn't a bank account with its name on it, there's no office for

4 it, you're not surprised or you're not disputing that. Your

5 point is the business -- there's still an extant company that

6 has the name Karupaiyan Consulting?

7         MS. GILROY: There is still a company. It is the

8 company formed by Mr. Karupaiyan's sister.

9         THE COURT: OK.

10         MS. GILROY: It does still exist at least, again, from

11 a state perspective purely. So to the extent there may be

12 creditors of that company that are owed money or anything along

13 those lines, the concern was making payment to Mr. Karupaiyan

14 would put us in the -- essentially in the line of fire.

15         THE COURT: Of course. No, no, and I understand that.

16         I'll talk to you in just a moment, sir.

17         No, I understand that, and there's nothing to say that

18 Ms. Karupaiyan could not tomorrow go set up a bank account in

19 the name of Karupaiyan Consulting --

20         MS. GILROY: Correct.

21         THE COURT: -- to which this check could be -- and the

22 check could be forwarded to her right away. OK. I understand

23 that.

24         So, Mr. Karupaiyan, I've been listening to the folks

25 at the back table talk about the issue. Their concern is

they'd give you the check to Karupaiyan -- well, if you were

authorized to receive it, they would give a check to Karupaiyan

Consultants, but you've just explained that right now, today

there's no bank account for that company, and so the check

would just -- no one would be able to negotiate it.

MR. KARUPAIYAN: Right. Also, they say that the

company's in existence. I am not sure. When we filed the loss

to -- to file tax return, no more the company -- when we filed

the state tax return, I think Form 941 or 921, when we file, we

file for -- check the mark saying that the business is no more,

no more active. So there is no point of the company acting in

state.

THE COURT: What I believe Ms. Gilroy is saying is

even if you have told tax authorities that the business is no

longer a going concern, from the state of New Jersey's

perspective, it is not a dissolved company. It's not a defunct

company. It still is an extant company. It still is an active

company even if it's not doing anything. So the concern would

be that were they to reissue the check in your name, we don't

have your sister here today to say: Go ahead, give it to him.

I'm not going to bring any -- I tell you on the record that I'm

not going to bring any action against them for this payment.

So that's what we need. We need some assurance that

you're authorized to receive these funds, that these were the

funds that Karupaiyan Consulting was going to pay to you, and

MAOHKarC

1  that your sister, both individually and as the sole

2  representative of the company, is disclaiming any right that

3  she has or that the company has to that payment.  She's not

4  here, so she can't make that representation.

5       Perhaps she could.  That's a thing that you all could

6  work on if you wanted to.  You could work with, I imagine --

7  and, Ms. Gilroy, you might disagree with me -- but if

8  Ms. Karupaiyan came forward and said, yes, I could start up

9  this company if I wanted to, but I don't.  I'm not going to

10  make a claim on this money.  This is money that I would have

11  immediately paid over to my brother.  You can give it to him

12  and I release any claims I might have, would that be acceptable

13  to you?

14       MS. GILROY:  The check is not coming from my client,

15  but I don't see why that would be unacceptable, particularly

16  with the Court's involvement.  The check is coming from APN.

17       MR. ZOLDESSY:  Under those circumstances, your Honor,

18  I would advise my client to promptly issue the check.

19       THE COURT:  Right.  So, I mean, again,

20  Ms. Karupaiyan's not here, but, Mr. Karupaiyan, if you and she

21  ever wanted to get on a telephone conference with me and with

22  the two defense counsel to work through that issue, I would

23  talk to her just like I'm talking to you right now.  And

24  depending on what her answers were, then perhaps -- let me ask

25  you this, Mr. Karupaiyan:  Ultimately, you want the check to be

1    issued to you individually, correct?

2            MR. KARUPAIYAN:  I can take it.  Yeah, I need money.

3    I don't have a place to live.  I need to rent a place.  I need

4    to go through medical treatments.  My fingers are bulging.

5            THE COURT:  I'm sorry about your finger.  Yes, so if

6    ever you and your sister reach out to defense --

7            MR. KARUPAIYAN:  My sister is in India.  She doesn't

8    speak English.  She does not have phone.  I need to call her

9    and talk to her through his -- I need to call her son.  He need

10   to do give the phone to her and talk to her.  Her visa is

11   expired.  I don't think she can come back here very soon.  My

12   sister is in India right now.

13           THE COURT:  Yes, I understand that.  Did you say she

14   doesn't speak English?

15           MR. KARUPAIYAN:  Doesn't speak English.

16           THE COURT:  But she still set up this company in New

17   Jersey?

18           MR. KARUPAIYAN:  I helped her to set up the company.

19           THE COURT:  So I guess I'm surprised that she had this

20   involvement in the company if she had no idea what was going

21   on.

22           MR. KARUPAIYAN:  She knows.  She signs the papers.

23   She signed the bank account, opened the bank account, yeah.

24           THE COURT:  Sir, she signed the paperwork for this

25   company, yes?

1    MR. KARUPAIYAN:  Yes.

2    THE COURT:  Was she able to read what she signed?

3    MR. KARUPAIYAN:  Not -- not really.

4    THE COURT:  Oh, that's not good.  OK.  All right.

5    Look, this may pose a problem for you, but I am not

6    going to suggest to the folks at the back table that they issue

7    a check to you when the contract was with Karupaiyan

8    Consulting.  So that's where we are.  If she wants to get

9    involved, if your sister wants to get involved to help you

10    bridge this gap, I can have a phone conference with all of you

11    on the phone, and I can ask her questions.  But I'd have to be

12    able to talk to her.

13    MR. KARUPAIYAN:  I can make arrangements, but I don't

14    think she can speak in English.

15    THE COURT:  Well, then that's probably going to end

16    the -- that's going to be very difficult for me to speak to her

17    about this, but all right.

18    MR. KARUPAIYAN:  Again, she's in India.  She does not

19    have phone right now.  I need to call her son and make the

20    arrangements.

21    THE COURT:  But, again, I'm not going to speak to her

22    unless I have some confidence that I can be able to speak to

23    her.  The alternative, sir, perhaps -- Mr. Zoldessy, would your

24    client accept a sworn statement, a notarized statement from

25    Ms. Karupaiyan that the entity is no longer conducting

1    operations and that she would disclaim and on behalf of the

2    company would disclaim any rights to these funds?  I don't

3    know.

4              MR. KARUPAIYAN:  I can offer affidavit from my sister

5    saying that they can directly pay me.

6              THE COURT:  Well, the issue, sir, is if your sister

7    doesn't speak English --

8              MR. KARUPAIYAN:  She can get affidavit.  She can sign

9    affidavit in India.  It's not difficult.

10              THE COURT:  Sure.  But who's writing this document?

11              MR. KARUPAIYAN:  The notaries are attorneys in India.

12    They will help the -- in India the notaries are attorneys.

13              THE COURT:  Yes.  No, I understand that, sir.  My

14    point is a different one.  What is this document -- what

15    language is this document going to be written?

16              MR. KARUPAIYAN:  They --

17              THE COURT:  Stop cutting me off, sir.

18              What language is document going to be written in?

19              MR. KARUPAIYAN:  Written in either language.  They can

20    interpret it and notary will sign the interpretation.

21              THE COURT:  I don't know if that's something the folks

22    at the back table would accept.  I don't know if they'd accept

23    a note -- a document that's been notarized and then translated

24    by a certified translator.  But the point is they need some

25    comfort that your sister is not going to come after them for

1    this money at some later date.  If you want to propose language

2    to them or if the folks at the back table want to propose

3    language to you that they would accept, then maybe this will

4    work.

5         But I'm taking your point, sir, which is that your

6    sister doesn't speak English very well, and I think that would

7    make her very uncomfortable speaking with me, and I do

8    understand that.  But that's the impasse where we are with

9    respect to the check issue.  I understand both sides of it.

10   I'll hear from you folks when there's some movement that's been

11   made by someone, whether that's a written submission that's

12   acceptable from Ms. Karupaiyan, whether that's filing

13   another -- or opening up another bank account in the name of

14   Karupaiyan Consulting, or something else, or a phone call where

15   I can speak to everyone.  I understand that's where the issue

16   is.

17        Let me please just go back a little bit, because

18   before I got you all sidetracked on the issue of the payments,

19   there was a question about a summary judgment motion.  So it

20   would appear that I am unable to persuade you not to file a

21   summary judgment motion.

22        Let me please ask, these would be two separate

23   motions, correct, counsel?

24             MS. GILROY:  I think it would have to be, your Honor.

25             THE COURT:  OK.  That's what I feared.

1            MS. GILROY:  Unfortunately.

2            THE COURT:  No, no, no, that's fine.  Can I have the

3    opening briefs December 2, or is that -- I don't know what's

4    going on in your corners of the world, so you have to tell me.

5            Oh, no, hold on.  You're about to tell me it's too

6    soon, Kate, because you have things to do at the end of the

7    month of November.  So let's try that again.

8            December 29, or will I wreck someone's holidays,

9    opening briefs on the 29th?

10           MR. ZOLDESSY:  That's fine for APN defendants.

11           THE COURT:  OK.  And for the CVS defendants?

12           MS. GILROY:  I do believe that will be fine, your

13   Honor.  I have an arbitration that was supposed to go forward

14   in two weeks that is currently in flux because of an expert

15   issue in that case, and I know we're looking at early December

16   for that as a potential date, but I don't know that that's

17   going to fly.  So I believe the 29th should work.

18           THE COURT:  Start writing now.  Thank you very much.

19           Let me then, Mr. Karupaiyan, I would like from you

20   one -- so this is going to be very similar to the motions to

21   dismiss.  They will each file a brief.  They will probably file

22   some declarations, which are sworn statements.  They'll

23   probably file some exhibits.  They'll file something called a

24   56.1 statement which lists the facts that they believe are not

25   in dispute.  I'm going to ask the parties, if at all possible,

1   to have your statements follow each other in sequence so that

2   there isn't a CVS paragraph 1, APN paragraph 1.  If it can be

3   done.  If it can't, you'll tell me.  But that would be

4   preferable for me.  Or perhaps here's a thought.  Perhaps one

5   of you could start at the number 1 and the other of you could

6   start at like number 500 or a number that we're never going to

7   get to so that there's not a duplication of numbers.

8           And then I will like from Mr. Karupaiyan a single

9   response, response to both of them, but I'll give you more

10  time, sir, and I'll also give you more space.  I'm expecting

11  and hoping that the defense counsel will you be able to get

12  theirs done in 25 pages of briefing.

13          MS. GILROY:  Inclusive of the 56.1 statement?

14          THE COURT:  No, no, that's a separate document.

15          MS. GILROY:  OK.

16          THE COURT:  But the memorandum of law should be 25

17  pages.

18          MS. GILROY:  OK, your Honor.

19          THE COURT:  And don't put it all in footnotes, because

20  I will send it back to you.

21          So, Mr. Karupaiyan, I would give you 40 pages to

22  respond because I don't think you're going to need exactly

23  double.  There's a lot of things that are going to be the same.

24  And I'm going to give you, sir, until -- hold on please --

25  February 17.

MAOHKarC

1    And then if I could please have the reply briefs --

2 I'll give you a little bit of extra time just in case there are

3 problems getting things -- the 10th of May, please.

4        MR. ZOLDESSY:  March?

5        THE COURT:  March.  I actually said that, too.  Yes, I

6 was looking, what is the third month of the year?

7        MS. GILROY:  I'm sorry.  Say that date again, your

8 Honor.

9        THE COURT:  Thank you.  I have May on the brain.  I

10 beg your pardon.  My deputy gave me that look as well.

11       May I ask, please, that defendants give to

12 Mr. Karupaiyan, whether electronically or in paper form, any

13 authority that you cite in your briefs, any case that you cite.

14 So I'll let you make arrangements whether you're emailing it to

15 him or giving him a lot of paper.

16       MS. GILROY:  I don't think we have anywhere to mail

17 paper, your Honor, so it would have to be electronic.

18       THE COURT:  That's right.

19       Mr. Karupaiyan, let me confirm, at this time, sir, it

20 is still your wish that everything be served on you

21 electronically?

22       MR. KARUPAIYAN:  It's preferable.  That is preferred.

23       THE COURT:  OK.  Then that's what it will be.  It will

24 be served electronically.

25       Just one moment, please, counsel and Mr. Karupaiyan.

MAOHKarC

1    All right.  So the replies, I'm thinking no more than

2    15 pages, please, for the replies.  So we're going to do 25

3    pages in the opening, a 40-page joint opposition, 15 pages on

4    the replies.  I'm fine if you go under 15 pages.  Thank you.

5    Those were the issues I wanted to address with the

6    parties today.  Mr. Karupaiyan, anything else to address today,

7    sir?

8    MR. KARUPAIYAN:  No.  What date will be the reply in

9    March?

10    THE COURT:  The reply date is March 10.  And I'm sorry

11    that I said May, because that gave them several months.

12    March 10.

13    May I please ask one of counsel to please get a

14    transcript of this conference.  I'll let you fight it out

15    afterwards as to who.  And please send a copy to Mr. Karupaiyan

16    when you receive it.  Thank you.

17    Mr. Zoldessy, anything else to address with me today,

18    sir?

19    MR. ZOLDESSY:  Not today, your Honor.  Thank you.

20    THE COURT:  I thank you as always.

21    Ms. Gilroy, anything else today?

22    MS. GILROY:  No, your Honor.  Thank you.

23    THE COURT:  All right.  Feel better.  Thank you.

24    We are adjourned.  Thank you all very much.

25    (Adjourned)