UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PALANI KARUPAIYAN,

                         Plaintiff,

                         -v.-

CVS HEALTH CORPORATION, AETNA INC.,
ACTIVEHEALTH MANAGEMENT, INC., LAKSHMI
KALYANI BELLAMKONDA, ROBERT DENNER, APN
CONSULTING, INC., VEDANT PATHAK, NEELA
PATHAK, and PURVI JHALA,

                         Defendants.

19 Civ. 8814 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

For a three-month period spanning June 2019 through August 2019,

Plaintiff Palani Karupaiyan, a software engineer of Indian origin, claims to have

suffered workplace discrimination, denial of reasonable accommodations for

his disability, deprivation of his wages, and even common-law battery at his job

site.  In the instant *pro se* litigation, Plaintiff brings federal, state, and

municipal claims against Aetna Inc. ("Aetna") and ActiveHealth Management

("AHM," and together with Aetna, "Aetna-AHM"),[1] as well as their parent

company, CVS Health Corporation ("CVS"), and two Aetna employees, Robert

Denner ("Denner") and Lakshmi Kalyani Bellamkonda ("Kalyani"), in their

individual capacities (all together, the "CVS Defendants").  Plaintiff also brings

claims against APN Consulting, Inc. ("APN"), the staffing company that

---

[1]    While Aetna and AHM are two separate entities, they are treated as one entity in
       Defendants' Local Rule 56.1 statement, and Defendants refer to them jointly in their
       briefing.

connected him with Aetna-AHM, as well as three APN employees, Vedant
Pathak ("Vedant"), Neela Pathak ("Neela"), and Purvi Jhala ("Jhala"), each in
their individual capacities (together, the "APN Defendants," and together with
the CVS Defendants, "Defendants").

In an Opinion and Order dated September 23, 2021, this Court granted
in part and denied in part Defendants' motions to dismiss the complaint,
dismissing the majority of Plaintiff's claims, but finding that Plaintiff's claims
for race and age discrimination, failure to accommodate, failure to receive pay,
and battery were adequately pleaded.  *See Karupaiyan* v. *CVS Health Corp.*,
No. 19 Civ. 8814 (KPF), 2021 WL 4341132 (S.D.N.Y. Sept. 23, 2021)
("*Karupaiyan I*").  With discovery now complete, Defendants move for summary
judgment as to Plaintiff's remaining claims.  Defendants' arguments focus on
two broad issues: *first*, whether Plaintiff can establish an employment
relationship with Aetna-AHM or APN sufficient to invoke the protections of the
relevant statutes; and *second*, whether Plaintiff musters sufficient facts to raise
triable issues regarding discrimination, failure to accommodate, and failure to
receive payment.

For the reasons that follow, the Court grants in part and denies in part
Defendants' motions for summary judgment.  In particular, the Court finds a
genuine dispute of fact as to whether Plaintiff had a qualifying employment
relationship with Aetna-AHM, but not with APN.  On the merits of Plaintiff's
claims, the Court finds that Plaintiff, by testifying to his own recollection of
allegedly racially discriminatory interactions with his supervisor at Aetna-AHM,

raises triable issues regarding some, but not all, of his race discrimination claims.  As to the remaining categories of claims — age discrimination, failure to accommodate Plaintiff's alleged disability, and failure to timely pay Plaintiff's wages — the Court grants summary judgment in Defendants' favor.  Finally, given the Court's resolution of Plaintiff's race discrimination claims, the Court retains supplemental jurisdiction over Plaintiff's battery claim against Denner and Jhala.

## BACKGROUND[2]

### A.   Factual Background

#### 1.    The Parties

Plaintiff Palani Karupaiyan, born in 1971, is a software engineer.  (Def. 56.1 ¶¶ 1-2).  Plaintiff "has 'dark/black' skin," and was born in Tamil Nadu, a

---

[2]    The facts set forth in this Opinion are drawn from the parties' submissions in connection with Defendants' motions for summary judgment.  The Court primarily sources facts from Defendants' Joint Local Rule 56.1 Statement ("Def. 56.1" (Dkt. #105)) and Plaintiff's Response to Defendants' Local Rule 56.1 Statement ("Pl. 56.1" (Dkt. #124)); the Declaration of Lakshmi Kalyani Bellamkonda ("Kalyani Decl." (Dkt. #102)) and the exhibits attached thereto; the Declaration of Vedant Pathak ("Vedant Decl." (Dkt. #103)) and the exhibits attached thereto, including the Contractor Agreement entered into between Karupaiyan Consulting and APN ("Contractor Agreement" (Dkt. #103-1)) and the Fee Schedule and Assignment Outline (the "Fee Schedule" (Dkt. #103-2)); the Declaration of Neela Pathak ("Neela Decl." (Dkt. #104)) and the exhibit attached thereto; the Declaration of Marcy A. Gilroy, Esq. ("Gilroy Decl." (Dkt. #107)); the Declaration of Robert Denner ("Denner Decl." (Dkt. #109)) and the exhibits attached thereto, including the Professional Services Agreement between Aetna and APN ("PSA" (Dkt. #109-1)) and the Aetna-AHM and APN Statement of Work ("SOW" (Dkt. #109-3)); the Declaration of Jason A. Zoldessy ("Zoldessy Decl." (Dkt. #112)) and the exhibits attached thereto, including Plaintiff's consolidated deposition transcript ("Pl. Dep." (Dkt. #112-3)); the Supplemental Declaration of Neela Pathak ("Neela Supp. Decl." (Dkt. #131)); and the Declaration of Plaintiff Palani Karupaiyan ("Pl. Decl." (Dkt. #122)) and the exhibits attached thereto.

For ease of reference, the Court refers to the CVS Defendants' memorandum of law in support of their motion for summary judgment as "CVS Br." (Dkt. #106); to the APN Defendants' memorandum of law in support of their motion for summary judgment as "APN Br." (Dkt. #111); to Plaintiff's omnibus memorandum of law in opposition to Defendants' motions as "Pl. Opp." (Dkt. #123); to the CVS Defendants' reply

state in southern India.  (*Id.* ¶ 2; Zoldessy Decl., Ex. A ¶ 25).  Plaintiff was born

with Situs Inversus Totalis ("SIT"), a genetic condition in which the organs of

his body are the mirror image of normal anatomy.  (Def. 56.1 ¶ 3).  At all

relevant times, Plaintiff served as the President of Karupaiyan Consulting, Inc.

("Karupaiyan Consulting"), a New Jersey corporation incorporated on August 1,

2016, of which his sister, Kannaki Radhakrishnan, was the owner.  (*Id.* ¶ 24;

Gilroy Decl., Ex. 3).

On May 28, 2019, Plaintiff, via Karupaiyan Consulting, entered into a

Contractor Agreement with APN, an information technology ("IT") staffing

company, regarding a technology project for AHM, a healthcare company and

wholly-owned subsidiary of Aetna, itself a healthcare company that sells

insurance and other benefits products.  (Def. 56.1 ¶¶ 8-9, 23).  Aetna and

AHM, in turn, are wholly-owned subsidiaries of CVS.  (*Id.* ¶ 8).

The various relationships among the parties, both contractual and

otherwise, bear heavily on the Court's analysis of Plaintiff's remaining claims,

and the Court therefore begins by discussing those relationships.  After that,

the Court chronicles the three-month period in which Plaintiff worked at Aetna-

AHM, focusing on the discrimination and other adverse employment conditions

he claims to have experienced during that time.

---

memorandum of law as "CVS Reply" (Dkt. #126); and to the APN Defendants' reply
memorandum of law as "APN Reply (Dkt. # 129).

### 2.    The Agreements

#### a.    The Professional Services Agreement Between APN and Aetna

Effective January 1, 2013, Aetna entered into a Professional Services Agreement with APN, whereby APN agreed to provide professional services to Aetna and its affiliates, including AHM.  (*See generally* PSA).  Under the terms of the PSA, Aetna-AHM and APN agreed to delineate the services to be provided by APN in separate schedules, and authorized APN to provide such services via subcontractors.  (Def. 56.1 ¶¶ 10-12).  Additionally, the PSA provided that the fees and charges for the services, the dates and sites for the services, and any other information deemed necessary would also be specified in those separate schedules.  (*Id.*).

Aetna-AHM could terminate the Agreement and/or the applicable schedule for any reason with ten days prior written notice to APN.  (Def. 56.1 ¶ 16 (citing PSA ¶ 13(B))).  Separately, in the event that Aetna-AHM reasonably determined that an individual performing services under the PSA was not doing so in a professional, workmanlike, and satisfactory manner, APN was required to discontinue using that individual in the performance of services.  (*Id.* ¶ 17).

In or about May 2019, Aetna-AHM sought APN's assistance in finding a contractor to work as a Senior Software Engineer.  (Def. 56.1 ¶ 20).  APN submitted Plaintiff's resume to Aetna-AHM, after which Plaintiff participated in technical interviews with engineers there.  (*See id.*; Pl. Dep. 159:9-160:9).  Concurrent with its screening of Plaintiff, Aetna-AHM advised APN that Plaintiff's skill set was more appropriate for a mid-level software engineer, and

asked that APN negotiate Plaintiff's rate downwardly to reflect that fact prior to onboarding.  (*Id.* ¶ 21).  When APN confirmed that Plaintiff's hourly rate could be reduced, Aetna-AHM approved the engagement of Plaintiff, and the parties proceeded with onboarding.  (*Id.* ¶¶ 21-22).

### b. The Contractor Agreement Between APN and Karupaiyan Consulting

With Aetna-AHM's approval, APN entered into a Contractor Agreement with Karupaiyan Consulting on or about May 28, 2019.  (Def 56.1 ¶ 23).  The Agreement recited that Karupaiyan Consulting maintained its principal business address at 606 Cinder Road in Edison, New Jersey.  (*Id.* ¶ 24).  This address was also Plaintiff's residence.  (*Id.*).

Under the terms of this Agreement, Karupaiyan Consulting would provide personnel — namely, Plaintiff — to perform programming and information technology services to APN and its end clients.  (Def. 56.1 ¶ 23). The Agreement established that only APN would invoice and collect payment from its client for services provided by Karupaiyan Consulting personnel, and that Karupaiyan Consulting would submit invoices, together with client-approved timesheets, to APN for payment at an agreed-upon rate set out in a separate fee schedule.  (*Id.* ¶ 27).

The Contractor Agreement provided that Karupaiyan Consulting's personnel would be considered independent contractors for all purposes; that APN would make no deductions from the fees paid to Karupaiyan Consulting for federal or state employment taxes; and that Karupaiyan Consulting was solely responsible for the taxes and benefits of its employees, and for procuring

workers' compensation insurance.  (Def. 56.1 ¶¶ 30-31).  The Contractor Agreement further provided that either party could terminate the Agreement on two weeks' written notice.  (*Id.* ¶ 29).

APN and Karupaiyan Consulting separately entered into a Fee Schedule & Assignment Outline, which was incorporated into the Contractor Agreement, and which provided details regarding the services Karupaiyan Consulting would perform for APN's "end client," identified as AHM.  (Def. 56.1 ¶ 37).  The document designated Plaintiff as the specific consultant who would perform the services, and the $68 hourly rate at which he would be compensated.  (*Id.*). Additionally, the schedule acknowledged that the engagement of Plaintiff with Aetna-AHM was a contract, the duration of which may last more time than estimated, but that once Aetna-AHM determined the project was completed, the Contractor Agreement would also terminate unless otherwise agreed.  (*Id.* ¶ 39; *see also* Fee Schedule 2).

### c.   The Statement of Work Between APN and Aetna

After Plaintiff was engaged by APN, Aetna-AHM and APN executed a Schedule or Statement of Work (the "SOW") in accordance with the PSA, effective June 17, 2023, which formalized Aetna-AHM's engagement of Plaintiff via Karupaiyan Consulting.  (Def. 56.1 ¶¶ 41-42).  The SOW provided that Plaintiff's services were to be performed on-site at Aetna-AHM, for an estimated forty hours per week, and that Aetna-AHM would provide Plaintiff with a laptop or workstation and other necessities for his work.  (*Id.* ¶ 43).  Exhibit A to the SOW contained a description of responsibilities and qualifications for the

position of "Product Owner (Care Management Value Stream)," which included technical and business elements such as "[o]wn[ing] team backlog and implementation," and "[c]oordinat[ing] with application users and various stakeholders (including other POs) to understand business problems, requirements, and goals that the business team need to achieve." (SOW 5). Under the SOW, Aetna-AHM would pay APN a rate of $85 per hour for the services provided by Plaintiff. (*Id.* ¶ 44). Plaintiff visited APN's offices to sign the engagement documentation. (Pl. Decl. ¶ 30).

### 3. Plaintiff's Work

With the engagement documentation complete, Plaintiff began providing services to Aetna-AHM on or about June 17, 2019. (Def. 56.1 ¶ 46). Plaintiff reported to Aetna-AHM's offices to perform his assigned work, and worked standard business hours of approximately 9:00 a.m. to 5:00 p.m., five days a week. (*Id.* ¶ 47). While at work, Plaintiff was supervised by Kalyani, the Aetna-AHM project manager for the work Plaintiff was performing under the SOW, who assigned to him tasks to be completed. (*Id.* ¶ 48).

Plaintiff worked on a team that included three contractors placed by APN and one full-time Aetna-AHM employee, all doing IT-related work. (Pl. Dep. 84:12-22). Plaintiff recalled a conversation with Kalyani, his supervisor, and one other individual in which they discussed U.S. immigration policy. (Def. 56.1 ¶ 75). During that conversation, Plaintiff expressed his political views on immigration policy, prompting Kalyani to call him a "black apple." (*Id.*; *see also* Pl. Dep. 93:20-94:3, 191:20-193:14).

Plaintiff noted that his desk was located in an area of the office that, due to construction, had falling dust and debris, which caused him to cough and have chest pain.  (Def. 56.1 ¶ 81).  According to Plaintiff, he approached Kalyani about the dust and debris issue, informed her of his situs inversus totalis condition, and requested that she move him to a different workspace, but his request was denied.  (Pl. Dep. 102:22-105:5, 203:3-205:9).

### 4.    The Termination of Plaintiff's Employment

A mere three months into Plaintiff's engagement, in mid-August 2019, Kalyani, together with her manager, made the decision to terminate Plaintiff's contract.  (Kalyani Decl. ¶ 3).  Kalyani avers that this decision to end Plaintiff's engagement "was based, in large part, on [Plaintiff's] inability to complete the tasks he was hired to perform and unprofessional behavior in the workplace, such as initiating disruptive political conversations with his team, falling asleep during work hours in front of the entire team and not paying attention during meetings."  (*Id.*).  Kalyani subsequently communicated this decision to Denner. (*Id.*; Denner Decl. ¶ 10).  Rather than elect to terminate the SOW for cause, however, Defendants made the decision to terminate the SOW pursuant to paragraph 13(B) of the PSA, and provide Plaintiff with two weeks' pay corresponding to the notice period to which he was entitled in the SOW.  (Def. 56.1 ¶ 50)

On August 26, 2023, Plaintiff was advised by Jhala and Denner that his engagement with Aetna-AHM was terminated.  (Def. 56.1 ¶ 49).  Plaintiff testified that, later that same day, Plaintiff witnessed Kalyani say, "[t]ell that

old black Madrasi [*i.e.*, Plaintiff] get out of here." (*Id.* ¶ 75; Pl. Dep. 97:23-24).

Worse yet, Plaintiff recalled that, after advising him of his termination, Denner

and Jhala took him from their meeting room to a separate dark room, where

they tried to take his laptop from him. (*See generally* Pl. Dep. 110:9-115:17).

In particular, Plaintiff asserts that Denner and Jhala physically took him by

the hand and dragged him into this dark room, where they pulled his hair and

kicked him. (*Id.*). After this interaction, Plaintiff was escorted out of the Aetna-

AHM offices by Jhala. (*Id.*).

### 5.    Plaintiff's Communications with APN

While Plaintiff worked in-person at Aetna-AHM during the relevant

period, he participated in several telephonic conversations with APN employees

Vedant and Neela Pathak regarding his payment under the Contractor

Agreement. In particular, Plaintiff recalls calling Vedant Pathak three times to

ask for his paycheck; in one of these conversations, after Plaintiff had been

terminated, Vedant Pathak called him either a "sick Madrasi" or a "black

Madrasi." (Pl. Dep. 82:1-83:1, 97:4-9, 196:5-7).

Plaintiff also testified to a telephonic conversation he had with Neela

Pathak, in which he asked her for money, in part due to his health conditions.

(Pl. Dep. 52:6-13, 95:7-96:2). In this conversation, Neela Pathak allegedly

called Plaintiff a "black old [M]adrasi"; told him she would "remove [him] from

the project"; and chided him for asking for money. (*Id.* 95:9-96:2, 195:20).

Plaintiff could not recall whether this conversation took place before or after his

termination. (*Id.* at 95:7-96:23).

10

### 6. The Payments to Plaintiff

Plaintiff prepared timesheets for the services he performed for Aetna-AHM from June 17, 2019, through approximately July 31, 2019, which timesheets were then approved by Kalyani. (Def. 56.1 ¶¶ 52-53). The timesheets submitted by Plaintiff covered two weeks in June and "approximately four weeks and six days in July," all corresponding to an eight-hour workday, forty-hour workweek. (*Id.* ¶ 52).

Plaintiff, through Karupaiyan Consulting, submitted invoices to APN, together with the approved timesheets, for the work he performed for Aetna-AHM in June and July 2019. (Def. 56.1 ¶ 54). Prior to his termination, Plaintiff had not submitted any timesheets for the month of August to Kalyani for approval. (*Id.* ¶ 55). To compensate Plaintiff for this time, APN, with the consent of Aetna-AHM, created a timesheet covering the August period, as well as the two-week notice period under the PSA and Contractor Agreement, and submitted them to Aetna-AHM for approval, which it subsequently granted. (*Id.*; *see also* Denner Decl. ¶ 13).

In accordance with the terms of the PSA, Aetna-AHM issued payment to APN for the services performed by Plaintiff as set forth in the approved timesheets. (Def. 56.1 ¶ 57). APN, in turn, issued checks payable to Karupaiyan Consulting in accordance with the Contractor Agreement for these services. (*Id.* ¶ 58).

In total, APN issued three checks to Plaintiff. APN issued the first payment, Check No. 13334, in the amount of $5,440 (reflecting 80 hours at

$68 per hour), for services provided in June.  (Def. 56.1 ¶ 59).  APN mailed this check to Karupaiyan Consulting at its registered office in Edison, New Jersey. (*Id.*).  Check No. 13334 was never cashed.  (*Id.* ¶ 60).  APN issued the second payment, Check No. 13366, in the amount of $11,968 (reflecting 176 hours at $68 per hour) for services provided in the month of July.  APN mailed this check to Karupaiyan Consulting, at the same address, on or about August 19, 2019.  (*Id.* ¶ 61).  The check was subsequently returned to APN, with a notation that the mail was not deliverable as addressed.  (*Id.* ¶ 62).  APN issued the third payment, in the amount of $14,688 (reflecting 216 hours at $68 per hour) for services rendered in August 2019 and for the two-week notice period.  APN mailed this check to Karupaiyan Consulting, at the same address, on or about October 14, 2019.  (*Id.* ¶ 63).  This check was also returned to APN, with the notation that the address was then vacant, and that the post office was unable to forward the check.  (*Id.* ¶ 64).

On October 23, 2019, Neela Pathak emailed Plaintiff to update him on his payments for the months of June, July, August, and September 2019. (Def. 56.1 ¶ 65).  Neela's email advised Plaintiff that two checks that had been mailed to him had been returned to APN as undeliverable, and requested Plaintiff to provide a new address and advise her as to how he wanted APN to handle the undelivered checks.  (*Id.* ¶¶ 66-67).

On August 11, 2022, APN attempted to deliver a check to Plaintiff during his deposition in this litigation for $32,096, the full amount due and owing to Karupaiyan Consulting, but Plaintiff refused to accept the check.  (Def. 56.1

¶ 68).  On Saturday, March 18, 2023, Plaintiff advised APN, through its counsel, that he was now willing to accept the check for the full balance due to him, made payable to Karupaiyan Consulting.  (Neela Supp. Decl. ¶ 2).  On Monday, March 20, 2023, APN issued a new check, No. 15674, payable to Karupaiyan Consulting, and provided that check to counsel for APN.  (*Id.* ¶ 4).  On March 22, 2023, that check was delivered to counsel and picked up by Plaintiff that same day.  (*Id.* ¶ 5).  Shortly thereafter, Plaintiff deposited the check.  (*Id.* ¶ 6).

## B.   Procedural Background

Plaintiff initiated this action on September 23, 2019, with the filing of a thirty-eight-count complaint against Defendants.  (Dkt. #2).  On March 9, 2020, the APN Defendants filed a pre-motion letter regarding its anticipated motion to dismiss the initial complaint.  (Dkt. #26).  On March 16, 2020, the CVS Defendants did the same.  (Dkt. #29).  On May 26, 2020, the Court held a pre-motion conference, during which it sought to clarify the allegations contained in Plaintiff's initial complaint, and granted Plaintiff leave to file an amended pleading.  (*See* Dkt. #56 at 9-21, 42-43 (transcript)).  Also at this conference, Plaintiff provided the Court with his consent to contact the New York Legal Assistance Group ("NYLAG") on his behalf to discuss preparing an amended pleading.  (*See id.* at 41).  The following day, the Court issued an order, which set a deadline for Plaintiff to file an amended complaint and informed Plaintiff that a NYLAG representative would contact him.  (Dkt. #32).

On July 31, 2020, Plaintiff filed the Amended Complaint, which is the operative pleading in this case.  (Dkt. #33-34).  On August 14, 2020, Defendants advised the Court of their intent to move to dismiss Plaintiff's Amended Complaint.  (Dkt. #35).  That same day, the Court granted Defendants' application and set a briefing schedule for their motions to dismiss.  (Dkt. #36).  Defendants filed their opening submissions on September 14, 2020.  (Dkt. #37-40 (APN); Dkt. #42-43 (CVS)).  After receiving an extension on the deadline for his opposition (see Dkt. #45), Plaintiff filed his opposition papers on December 15, 2020 (Dkt. #46), and December 22, 2020 (Dkt. #47).  Defendants filed their reply papers on February 22, 2021. (Dkt. #48 (CVS); Dkt. #49-50 (APN)).[3]

On September 23, 2021, the Court issued an Opinion and Order granting in part and denying in part Defendants' motion.  *See Karupaiyan I*, 2021 WL 4341132.  (Dkt. #58).  In that Opinion, the Court dismissed the majority of Plaintiff's claims, but found that several could proceed to discovery, including claims for:

- Race Discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17, against CVS, Aetna, AHM, and APN, related to the circumstances of Plaintiff's termination and his failure to receive pay;

---

[3]     On March 23, 2021, Plaintiff filed motions seeking to compel Defendants to produce a laptop in discovery and to move for summary judgment due to Defendants' purported destruction of evidence.  (Dkt. #51-53).  That same day, the Court denied these motions as premature, noting the pendency of Defendants' two fully-briefed motions to dismiss. (Dkt. #54).  Though these motions were denied without prejudice, Plaintiff has not subsequently raised them in this litigation.

- Race Discrimination under 42 U.S.C. § 1981 against CVS, Aetna, AHM, APN, Kalyani, Neela, and Vedant, related to the circumstances of Plaintiff's termination and failure to receive pay;

- Race Discrimination under the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law §§ 290 to 301, and the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code §§ 8-101 to 8-134, against CVS, Aetna, AHM, APN, Kalyani, Neela, and Vedant, related to the circumstances of Plaintiff's termination and failure to receive pay;

- Age Discrimination under the NYCHRL against CVS, Aetna, AHM, and APN, related to the circumstances of Plaintiff's termination;

- Failure to Accommodate Plaintiff's Disability under the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12101-12213, the NYSHRL, and the NYCHRL against CVS, Aetna, AHM, and APN, related to Plaintiff's request to move his desk away from falling dust;

- Hostile Work Environment under the NYCHRL against CVS, Aetna, AHM, APN, Kalyani, Neela, and Vedant, related to Plaintiff's claim of inferior workplace treatment due to his race;

- Minimum Wage and Timely Payment under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, and the New York Labor Law ("NYLL"), N.Y. Lab. Law §§ 190-199-A, against CVS, Aetna, AHM, and APN, related to the circumstances of Plaintiff's failure to receive pay; and

- Common-law battery against Denner and Jhala for the alleged physical altercation on August 26, 2019.

*Id.* at *36-37.

On March 21, 2022, the Court entered the parties' case management plan and the parties commenced discovery.  (Dkt. #75).  On October 24, 2022, following the completion of fact discovery, the Court held a post-fact discovery

conference, during which it set a briefing schedule for Defendants' motions for summary judgment.  (October 24, 2022 Minute Entry).  Defendants filed their motions and supporting documents on December 29, 2022.  (Dkt. #95-109 (CVS); Dkt. #110-19 (APN)).  On March 20, 2023, Plaintiff filed his opposition brief and supporting documents.  (Dkt. #122-124).  On April 10, 2023, Defendants filed reply briefs and supporting documentation in support of their motions.  (Dkt. #126-131).

## DISCUSSION

### A.    Motions for Summary Judgment Under Rule 56(a)

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).[4]  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys* v. *City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005).

---

[4]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

"It is the movant's burden to show that no genuine factual dispute exists" and a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  If the movant has met its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal citations and quotation marks omitted).  The nonmoving party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).  Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

Where a plaintiff is *pro se*, a court must read his or her pleadings "liberally and interpret them to raise the strongest arguments that they suggest." *Jorgensen* v. *Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks omitted).  Courts "are less demanding of [*pro se*] litigants generally, particularly where motions for summary judgment are concerned." *Jackson* v. *Federal Express*, 766 F.3d 189, 195 (2d Cir. 2014).  A *pro se* litigant thus is given "special solicitude" in responding to a motion for

summary judgment. *Tracy* v. *Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010). This solicitude, however, "does not relieve [the *pro se* litigant] of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen*, 351 F.3d at 50 (internal quotation marks omitted).

Here, the Court's task has been complicated by Plaintiff's imperfect compliance with Local Rule 56.1.  Under that rule, a movant is required to identify admissible evidence in support of each factual assertion in his or her Rule 56.1 statement.  *See* S.D.N.Y. Local Rule 56.1(d) ("Each statement by the movant ... pursuant to Rule 56.1(a) ... must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."). Conversely, a non-movant seeking to controvert these factual assertions must also cite to admissible evidence, and where properly supported facts in a Local Rule 56.1 statement are denied with only conclusory assertions, the court will find such facts to be true.  *See id.*; *id.* at 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").

Even where there is incomplete compliance with the Local Rules, a court retains discretion "to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." *Wali* v. *One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009); *see also Holtz* v. *Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the

parties fail to point out in their Local Rule 56.1 Statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." (internal quotation marks omitted)).  The Court has done so here.  *See generally Cain* v. *Esthetique*, 182 F. Supp. 3d 54, 63 (S.D.N.Y. 2016) (discussing a court's discretion with respect to *pro se* submissions opposing motions for summary judgment), *aff'd sub nom. Cain* v. *Atelier Esthetique Inst. of Esthetics Inc.*, 733 F. App'x 8 (2d Cir. 2018) (summary order).

## B.    Certain of Plaintiff's Race Discrimination Claims Under Title VII, Section 1981, the NYSHRL, and the NYCHRL Survive Summary Judgment

The Court begins with Plaintiff's claims of race discrimination under Title VII, Section 1981, and the NYSHRL.  In particular, Plaintiff alleges that he failed to receive pay to which he was entitled and was terminated from Defendants' employ on account of his race.  Defendants counter that they are entitled to summary judgment on two grounds: *first*, Plaintiff cannot establish an employment relationship with either Aetna-AHM or APN, a necessary element of Plaintiff's Title VII and NYSHRL claims; and *second*, Plaintiff cannot prove the substantive elements of his claims.

For the reasons below, the Court finds that Plaintiff has presented evidence sufficient to generate a triable issue concerning his employment relationship with Aetna-AHM, but not with CVS, and, further, that disputed questions of material fact preclude summary judgment as to Plaintiff's discriminatory termination claims, but not his discriminatory failure to receive

pay claims.  With respect to APN, by contrast, the Court finds that Plaintiff cannot establish an employment relationship as a matter of law, and that no reasonable juror could find in favor of Plaintiff on his discrimination claims against that entity.  The Court therefore grants summary judgment in part as to Plaintiff's race discrimination claims against Aetna-AHM, and grants summary judgment in full as to his claims against CVS and APN.

### 1.  Applicable Law

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color[.]" 42 U.S.C. § 2000e-2(a)(1).  Similarly, the NYSHRL makes it "an unlawful discriminatory practice" for an employer, based on an individual's race or color, "to discriminate against such individual in compensation or in terms, conditions or privileges of employment."  N.Y. Exec. Law § 296(1)(a).  Finally, Section 1981 provides that all "persons ... shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens."  42 U.S.C. § 1981(a).

In addition to covering both employers and parties in independent contract relationships, Section 1981 allows for individual liability under federal law, whereas Title VII does not.  *See Tolbert* v. *Smith*, 790 F.3d 427, 434 n.3 (2d Cir. 2015).  The same is true for the NYSHRL, which provides that a supervisor can be held individually liable if she "actually participates in the conduct giving rise to [the] discrimination."  *Gorman* v. *Covidien, LLC*, 146 F. Supp. 3d 509,

522 (S.D.N.Y. 2015) (quoting Feingold v. *New York*, 366 F.3d 138, 157 (2d Cir. 2004)) (internal quotation marks omitted).

> ### 2.   Analysis

> #### a.   Plaintiff's Putative Employers

> ##### i.   Plaintiff Has Raised a Genuine Dispute of Material Fact Regarding an Employment Relationship With Aetna-AHM, But Not With CVS or APN

To be held liable under Title VII and the NYSHRL, an employer-employee relationship must have existed between the parties at the time of the alleged discrimination. *See Kern* v. *City of Rochester*, 93 F.3d 38, 44-45 (2d Cir. 1996). To determine whether an individual is an employee (as opposed to an independent contractor) under these statutes, courts apply the common law of agency. *Eisenberg* v. *Advance Relocation & Storage, Inc.*, 237 F.3d 111, 113-14 (2d Cir. 2000).

"[W]hether a hired person is an employee under the common law of agency depends largely on the thirteen factors articulated by the Supreme Court in *Community for Creative Non-Violence* v. *Reid*, 490 U.S. 730 (1989)." *Eisenberg*, 237 F.3d at 113-14. This non-exclusive list of factors includes:

> [i] the hiring party's right to control the manner and means by which the product is accomplished; [ii] the skill required; [iii] the source of the instrumentalities and tools; [iv] the location of the work; [v] the duration of the relationship between the parties; [vi] whether the hiring party has the right to assign additional projects to the hired party; [vii] the extent of the hired party's discretion over when and how long to work; [viii] the method of payment; [ix] the hired party's role in hiring and paying assistants; [x] whether the work is part of the regular business of the hiring party; [xi] whether the hiring party is in business; [xii] the provision of

employee benefits; and [xiii] the tax treatment of the
hired party.

*Id.* at 114 (quoting *Reid*, 490 U.S. at 751-52).  In weighing the above factors, a

court must disregard factors that are irrelevant or of indeterminate weight.  *Id.*

(citing *Aymes* v. *Bonelli*, 980 F.2d 857, 861, 863 (2d Cir. 1992)).  No single

factor is dispositive, but the "greatest emphasis" must be placed on the first

factor — the manner and means by which the worker completes his assigned

tasks.  *Id.*

Defendants argue that there is no need to consider the *Reid* factors,

because the relevant contracts dictate a finding that Plaintiff was in an

independent contractor relationship with both Aetna-AHM and APN as a matter

of law.  In particular, Defendants maintain that "Plaintiff was not hired by

Aetna-AHM or APN.  To the contrary, *Karupaiyan Consulting, Inc.* — a corporate

entity that Plaintiff *admits* was his employer — contracted with APN to provide

information technology services that APN originally contracted to provide to

Aetna-AHM."  (CVS Br. 9-10).

In support of their position, Defendants rely on a decision from a sister

court in this District, *Meyenhofer* v. *Larsen & Toubro Infotech Ltd.*, 503 F. Supp.

3d 39 (S.D.N.Y. 2020), which Defendants claim stands for the proposition that

"the *Reid* factors need not be applied at all if the relationship does not

'plausibly approximate the employee relationship in the first place, namely the

worker must be hired by and receive some form of remuneration from the

putative employer.'"  (CVS Br. 9 (quoting *Meyenhofer*, 503 F. Supp. 3d at 46

22

(citing *O'Connor* v. *Davis*, 126 F.3d 112, 115-16 (2d Cir. 1997), *cert. denied*,

522 U.S. 1114 (1998)))).  A closer reading of *Meyenhofer*, however, reveals that

the court there applied the *Reid* factors, and expressly rejected the contention

advanced by Defendants in this case, *viz.*, that the contractual arrangements

were such that the relationship could not "plausibly approximate the employee

relationship."  503 F. Supp. 3d at 46-47.  Even in *O'Connor*, on which the

*Meyenhofer* court relied, the Second Circuit found no employment relationship

in light of the fact that the plaintiff in that case worked as an "unpaid intern,"

and could not be considered a "hired party" and therefore an employee.

*O'Connor*, 126 F.3d at 115.[5]

Setting the competing interpretations of *Meyenhofer* to the side, the

Court finds that Defendants' argument is also at odds with well-established

anti-discrimination precedent, which dictates that "the right to be treated in a

nondiscriminatory matter does not depend on the terms of any particular

contract."  *Eisenberg*, 237 F.3d at 116; *see also id.* at 117 ("[E]mployment

contracts, no matter what the circumstances that justify their execution or

what the terms, may not be used to waive protections granted to an individual

under [Title VII] or any other [A]ct of Congress." (quoting *Spirides* v. *Reinhardt*,

---

[5]    Though the Court recognizes that the employment status of unpaid interns has
changed for the purposes of wage and hour statutes such as the FLSA, *see Glatt* v. *Fox
Searchlight Pictures, Inc.*, 811 F.3d 528, 536 (2d Cir. 2016), the Second Circuit has
recently reacknowledged the bar against suits brought under Title VII by unpaid interns
and volunteers.  *See Felder* v. *United States Tennis Ass'n*, 27 F.4th 834 (2022) (citing
*O'Connor* v. *Davis*, 126 F.3d 112, 115 (2d Cir. 1997) (holding that Title VII does not
apply to an "unpaid intern" because she is not an "employee"), *cert. denied*, 522 U.S.
1114 (1998)); *see also York* v. *Ass'n of Bar of City of New York*, 286 F.3d 112, 123 (2d
Cir. 2002) (holding that a volunteer for the Association of the Bar of the City of New
York was not an employee under Title VII)).

613 F.2d 826, 832 (D.C. Cir. 1979))).  This remains the case despite specific language in the Contractor Agreement designating Plaintiff as an independent contractor.  (Consulting Agreement ¶ 15).  As the Second Circuit advised in *Eisenberg*, "a firm cannot buy from a worker an exemption from the substantive protections of the anti-discrimination laws because workers do not have such an exemption to sell, and any contractual term that purports to confer such an exemption is invalid."  237 F.3d at 117.

Accordingly, the Court rejects Defendants' opening argument that the relevant contract provisions preclude consideration of either Aetna-AHM or APN as an employer.  To the extent such contractual language or arrangement weighs on any one of the *Reid* factors analyzed below, the Court discusses it separately there.

### ii. Plaintiff Has Presented Sufficient Evidence of an Employment Relationship with Aetna-AHM

The Court proceeds to consider whether Plaintiff can establish a common-law employment relationship with CVS, Aetna, or AHM sufficient to fall within the scope of Title VII and the NYSHRL.  Ultimately, the Court finds that Plaintiff has presented evidence sufficient to generate a triable issue regarding an employment relationship between himself and Aetna-AHM.  However, Plaintiff has not demonstrated a similar relationship with respect to CVS, either standing alone or as a function of its parent-subsidiary relationship with Aetna-AHM.

The first *Reid* factor, "the hiring party's right to control the manner and means by which the product is accomplished," is the most important.

*Eisenberg*, 237 F.3d at 115; *see also id.* (advising that "the 'greatest emphasis' should be placed on the first factor" (quoting *Frankel* v. *Bally, Inc.*, 987 F.2d 86, 90 (2d Cir. 1993))).  In analyzing this factor, "[t]he issue is the balance between the employee's judgment and the employer's control."  *Salamon* v. *Our Lady of Victory Hosp.*, 514 F.3d 217, 229 (2d Cir. 2008).  Here, the undisputed facts favor Plaintiff.  While the SOW speaks generally of Plaintiff's responsibilities related to Aetna's care management value stream (*see* SOW 5), the record discloses that Plaintiff's actual, day-to-day responsibilities were set by Kalyani, his supervisor and an Aetna-AHM employee.  (Def. 56.1 ¶ 48; Pl. Dep. 83:23-24).  *See Eisenberg*, 237 F.3d at 118 (finding that the giving of daily orders to a party weighs in favor of finding them to be an employee).  Nor do Defendants offer any facts suggesting that Plaintiff exercised significant discretion in the performance of his functions, which autonomy would militate against a finding that Aetna-AHM exercised a high degree of control.  This daily supervisory relationship, therefore, is exactly the type of "close, pervasive control" over a worker that is the hallmark of an employment relationship.  *Eisenberg*, 237 F.3d at 119; *accord Yu* v. *N.Y.C. Hous. Dev. Corp.*, No. 07 Civ. 5541 (GBD) (MHD), 2011 WL 2326892, at *30 (S.D.N.Y. Mar. 16, 2011) (finding summary judgment inappropriate where "a reasonable jury could find that [defendants] had not only the prerogative to determine the objective of [plaintiff's] work … but also the ability to define which tasks plaintiff would undertake to accomplish their goal, and how and when he would undertake them"), *report and recommendation adopted*, No. 07 Civ. 5541 (GBD), 2011 WL 2183181

(S.D.N.Y. June 3, 2011), *aff'd*, 494 F. App'x 122 (2d Cir. 2012) (summary order).

Defendants wisely choose to focus their efforts on the remaining elements of *Reid*'s analysis, rather than on disputing the first factor.  With that in mind, and based on its own careful review of the record, the Court finds that the first factor strongly favors finding Plaintiff was in an employment relationship with Aetna-AHM.  *See Amarnare* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 611 F. Supp. 344, 348 (S.D.N.Y. 1984) ("When an employer has the right to control the means and manner of an individual's performance, as [defendant] allegedly had with regards to [temporary worker], an employer-employee relationship is likely to exist."), *aff'd sub nom. Aharnare* v. *Merrill Lynch*, 770 F.2d 157 (2d Cir. 1985).

The weight of the second factor, the skill required of the work, is less clear.  It is undisputed that Plaintiff is a software engineer, with significant work experience in the field.  (*See* Def. 56.1 ¶ 21; Pl. Dep. 33:10-40:16 (recounting Plaintiff's prior employment)).  Defendants suggest that this position constitutes high-skilled work and weighs in their favor.  (*See* CVS Br. 10).  But while courts have observed that software engineers are within the high-skill professions that tend to be independent contractors, this conclusion is found most frequently in the context of copyright disputes.  *See, e.g., Aymes*, 980 F.2d at 862 (finding "computer programmers to be highly-skilled independent contractors," in programmer's copyright dispute with client).  In that setting, the skill factor weighs more heavily in the analysis, as it bears on

questions of authorship of a work prepared pursuant to an agreement.  *See id.* at 860 (discussing the Copyright Act).  Such concerns are less relevant in the anti-discrimination context, where the court's primary concerns include the conditions of an individual's workplace and his or her right to be free from discrimination.  *See Eisenberg*, 237 F.3d at 116-17 (discussing the distinction between the work-for-hire doctrine and anti-discrimination law, and declining to import *Aymes*'s weighting of the *Reid* factors from copyright law into anti-discrimination law).

Even assuming Plaintiff's occupation as a software engineer were relevant, this position encompasses a wide range of roles and responsibilities spanning the skill spectrum.  This is not to denigrate Plaintiff's level of skill, but rather to avoid suggesting that a software engineer, *per se*, is a high-skilled individual likely to be an independent contractor.  Indeed, Defendants' argument that Plaintiff is a high-skill employee is undercut by their own actions in negotiating to lower his hourly rate by suggesting his skill set was more appropriate for a mid-level software engineer than for a senior software engineer.  (Def. 56.1 ¶ 21).  Resolving all inferences in Plaintiff's favor, the Court finds this factor to be of no weight.

The third and fourth factors, the party providing necessary instrumentalities and the location of work, both favor Plaintiff.  It is undisputed that Aetna-AHM provided Plaintiff with his computer, a necessary instrumentality in his position, and that Plaintiff worked regular business hours at an Aetna-AHM office.  (Def. 56.1 ¶¶ 47-48).  Aetna-AHM suggests that

this significance should be discounted, as the sensitivity of the data and confidential nature of the business dictated that Plaintiff could not provide his own equipment nor work remotely.  (CVS Br. 10).  Still, Defendants' justifications for why Plaintiff's workplace was structured a certain way are less relevant to the *Reid* analysis in the anti-discrimination context, which is concerned with the "day-to-day reality" of a worker's relationship to his putative employer.  *Eisenberg*, 237 F.3d at 119.  The Court therefore finds these factors favor Plaintiff.

The fifth factor, the duration of the relationship between the parties, is of neutral significance.  It is undisputed that the SOW specified a six-month term, which ordinarily favors the finding that a worker is an independent contractor. *See Eisenberg*, 237 F.3d at 117 ("A relatively short tenure [such as 28-35 days] ordinarily implies that a worker is an independent contractor.").  Still, the fact of the term renewal provision (*see* SOW 3), as well as the open-ended nature of the "Project Overview" (*see id.* at 5), weighs against finding that Plaintiff was engaged for a discrete, six-month project.  Moreover, Plaintiff testifies that Neela Pathak represented to him that the position would be full-time for at least a year.  (Pl. Dep. 51:20-25).  At best, therefore, this factor does not weigh in favor of either party.  *Eisenberg*, 237 F.3d at 117-18 ("[W]here ... the brevity of [the worker's] stint at [employer] does not suggest much of anything," the factor is of no weight.).

The sixth factor, whether the hiring party has the right to assign additional projects to the hired party, favors Plaintiff.  The project overview in

the SOW contemplates an open-ended "Product Owner" position, working collaboratively with various stakeholders and technical teams (both of which presumably included Aetna-AHM employees) to deliver features.  (SOW 5). And as discussed above, the reality of Plaintiff's work at Aetna-AHM was that his tasks were assigned on a daily basis by Kalyani, an Aetna-AHM employee and his direct supervisor.  Such an arrangement, which is "ostensibly a single project, but [which] contain[s] a plethora of additional assignments and individual tasks, all of which were presumably assigned to plaintiff by [his supervisor], ... suggests that plaintiff was an employee and not an independent contractor."  *Yu*, 2011 WL 2326892, at *29.  The Court therefore finds that this factor favors Plaintiff.

The seventh and eighth factors — the extent of the hired party's discretion over when and how long to work, and the method of payment — favor Plaintiff.  Plaintiff worked a standard forty-hour work week at Aetna-AHM's offices, as was contemplated by the SOW, and was paid pursuant to an hourly rate.  (*See* SOW 3-4).  *Eisenberg*, 237 F.3d at 119 ("Compensation primarily or exclusively on the basis of time worked (rather than on the basis of projects completed) suggests that a worker is an employee." (citing *Aymes*, 980 F.3d at 862)).

The ninth factor, the hired party's role in hiring and paying assistants, is irrelevant to this case, as neither party hired any assistants for the work in question.  *See Eisenberg*, 237 F.3d at 118 (according no weight where neither party actually hired assistants).

The tenth and eleventh factors — whether the work is part of the regular business of the hiring party and whether the hiring party is in business — favor Plaintiff.  Plaintiff worked on Aetna-AHM and CVS products during his time at Aetna-AHM, and the project overview in the SOW characterizes his role as a "Product Owner."  (SOW 5).  Defendants attempt to dispute this, suggesting that "Aetna-AHM is a healthcare company not an IT company, which was Plaintiff's business."  (CVS Br. 10).  The Court is unpersuaded by Defendants' semantic argument, which overlooks the fact that Aetna-AHM hired Plaintiff to work on health technology products that were consistent with its broader business.  *Cf. Aymes*, 980 F.2d at 863 (observing that "work done by a computer programmer employed by a computer software firm would be done in the firm's regular business").  The Court instead finds that these factors favor Plaintiff.  *See Stack* v. *Karr-Barth Assocs., Inc.*, No 18 Civ. 10371 (VEC), 2021 WL 1063389, at *6 (S.D.N.Y. Mar. 18, 2021) ("If a hired party 'is performing tasks that directly relate to the objective of the hiring party's business,' it lends credence to an employer-employee relationship." (quoting *Aymes*, 980 F.2d at 863)).

The final two factors, the provision of employee benefits and the tax treatment of the hired party, slightly favor Defendants.  It is undisputed that Aetna-AHM did not provide Plaintiff with benefits and did not consider Plaintiff to be an employee for tax purposes.  These factors therefore favor Aetna-AHM.

While *Reid* instructs courts to evaluate its thirteen factors, the Court's ultimate conclusion is not dictated by algebra.  *See Aymes*, 980 F.2d at 861-62

(finding that the *Reid* test "was not intended to be applied in a mechanistic fashion").[6]  Rather, the Court must assess the factors holistically, with particular consideration given to the degree of control exercised by the putative employer over the putative employee.  On this record, Plaintiff has identified a triable dispute regarding his employment relationship with Aetna-AHM.  After all, Plaintiff was directly supervised and assigned tasks by an Aetna-AHM employee and worked directly on Aetna-AHM products.  Plaintiff worked a standard workweek at Aetna-AHM's offices, and used Aetna-AHM equipment.  And while Plaintiff was paid directly by APN, such payment was dictated entirely by timesheets approved by Aetna-AHM, and was drawn from funds paid by Aetna-AHM to APN pursuant to the PSA.  *Cf. Meyenhofer*, 503 F. Supp. 3d at 47 (observing that "allow[ing] employers to insulate themselves from Title VII liability simply by using a flow-through entity to pay employees" would be antithetical to the purpose of the Act).  Taking all of these considerations together, the Court finds that Plaintiff has raised a genuine dispute regarding the existence of an employment relationship with Aetna-AHM sufficient to invoke the protections of Title VII and the NYSHRL.

The same cannot be said as to Plaintiff's proffered employment relationship with CVS, the ultimate corporate parent of Aetna-AHM.[7]  To assess

---

[6]    Even taking an algebraic approach, the Court finds that eight factors favor Plaintiff, including the control factor that courts have found to be most significant; two factors favor Aetna-AHM; and three factors are neutral.  *See generally Eisenberg* v. *Advance Relocation & Storage, Inc.*, 237 F.3d 111, 114 (2d Cir. 2000).

[7]    In light of the absence of any facts suggesting that Plaintiff had any interactions with CVS employees as supervisors, coworkers, or otherwise; that Plaintiff worked at any CVS office; or that Plaintiff entered into any relevant agreements with CVS, the Court

whether a parent is liable to a subsidiary's employee under Title VII and the NYSHRL, courts consider four factors: (i) interrelation of operations; (ii) centralized control of labor relations; (iii) common management; and (iv) common ownership or financial control.  *See Cook* v. *Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995) (Title VII); *McHenry* v. *Fox News Network, LLC*, 510 F. Supp. 3d 51, 81 (S.D.N.Y. 2020) (NYSHRL).  The focus of this inquiry is on the second factor — centralized control of labor relations — which considers the critical question of "[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?" *Cook*, 69 F.3d at 1240 (quoting *Trevino* v. *Celanese Corp.,* 701 F.2d 397, 404 (5th Cir. 1983)).

The record here shows no involvement by CVS in the labor relations of Aetna-AHM.  Plaintiff admittedly knows little about the relationship between CVS and Aetna-AHM, and relies principally on the mere fact of the parent-subsidiary relationship between the two entities.  (Pl. Opp. 2 (citing Def. 56.1 ¶ 8); *see also* Def. 56.1 ¶ 73).  Such reliance, however, is unavailing, inasmuch as "[t]he Second Circuit has [] recognized that the third and fourth factors — common management and common ownership — are, in particular, ordinary

---

considers an evaluation of the *Reid* factors to be unnecessary, as no reasonable juror could find in Plaintiff's favor.  Similarly, Plaintiff's arguments that CVS was his joint employer are unavailing, as Plaintiff does not claim that he was employed by Aetna-AHM but was in fact working at CVS.  *See Arculeo* v. *On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005) (observing that "[the joint employer] doctrine is operative [where] an employee, formally employed by one entity, [] has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity").

aspects of the parent-subsidiary relationship, which often may be of limited
use in determining whether to treat two or more corporate affiliates as a single
employer." *Han* v. *Kuni's Corp.*, No. 19 Civ. 6265 (RA), 2020 WL 2614726, at *8
(S.D.N.Y. May 22, 2020) (internal quotation marks and citation omitted,
alteration adopted).  Nor has the Court's own generous review of the record,
undertaken on account of Plaintiff's *pro se* status, identified any facts to
support such a relationship.  Absent evidentiary support for this critical second
element, no reasonable trier of fact could find CVS to be a single integrated
enterprise for the purposes of Title VII and the NYSHRL, and therefore
Plaintiff's claims against CVS under these statutes must be dismissed.

### iii.    Plaintiff Cannot Establish an Employment Relationship with APN

Applying the *Reid* analysis to Plaintiff's interactions with APN, the Court
concludes that Plaintiff cannot establish the employment relationship
necessary to press his claims under Title VII and the NYSHRL.  On this point,
the Court agrees with APN that its interactions with Plaintiff were minimal as
compared to those with Aetna-AHM, and dictated by APN's obligations to
Aetna-AHM under the PSA.  (*See* APN Br. 11-12).

The Court has already explained the contours of the *Reid* analysis, and
therefore proceeds directly to its analysis of the factors.  For brevity, the Court
first discusses those factors with most significance to framing the relationship
between Plaintiff and APN, and addresses the remaining factors at the end.

Beginning with the first and most significant factor, the Court finds that
APN had little control over the manner and means of Plaintiff's work.  Here,

APN correctly observes that its role in the tripartite relationship of Plaintiff, APN, and Aetna-AHM was effectively that of facilitator, first sourcing and connecting Plaintiff to Aetna-AHM for work, and then enabling Aetna-AHM's subsequent payment to Plaintiff for his services rendered.  (*See* APN Br. 12 ("The undisputed material facts demonstrate that APN's involvement with Plaintiff's contracting services for Aetna-AHM generally were limited to the events surrounding the commencement of the engagement.")).  While Plaintiff generally disputes this characterization, he provides no evidence that APN assigned him projects, that he was actively supervised by any individual from APN, or that he delivered any actual work to APN.  The Court therefore finds that this first factor favors APN.

The majority of the remaining factors also favor APN.  APN neither provided the instrumentalities and tools for Plaintiff's work at Aetna-AHM (third factor), nor did Plaintiff work at APN's offices (fourth factor).  Plaintiff's Contractor Agreement and the accompanying Fee Schedule contain no provisions entitling APN to assign additional projects to Plaintiff without additional agreement (sixth factor), nor does either contain provisions constraining Plaintiff's discretion over when and how long to work (seventh factor).  (*See* Contractor Agreement; Fee Schedule).  Finally, APN provided no employee benefits to Plaintiff (twelfth factor), nor did it treat Plaintiff as an employee for tax purposes (thirteenth factor).  (*See* Contractor Agreement ¶¶ 15-19).

34

Only the eighth, tenth, and eleventh factors favor Plaintiff, and even then not sufficiently enough to impact the Court's analysis.  Plaintiff was paid an hourly rate (eighth factor).  APN is a staffing company focused on information technology, and Plaintiff's services were technology-related, albeit for Aetna-AHM, the end client (tenth and eleventh factors).  (Def. 56.1 ¶¶ 9, 37).  These factors may technically favor the finding of an employment relationship, but they bear little on the matter of APN's day-to-day control over Plaintiff, which is the crux of the analysis.  *Cf. Eisenberg*, 237 F.3d at 119 (discounting facts "which have little to do with the day-to-day reality of [plaintiff's] relationship to [putative employer]").

Finally, the Court finds the second, fifth, and ninth factors to be either of neutral significance or of little relevance to the analysis, and therefore accords them no weight.  As discussed in the context of Plaintiff's work at Aetna-AHM, the skill required for the contemplated work is of neutral significance (second factor), as is the short duration of his work (fifth factor).  And neither party hired or paid assistants (ninth factor).  *See Eisenberg*, 237 F.3d at 117-18 (disregarding neutral or irrelevant factors).

Assessing these factors holistically, with particular consideration given to the minimal degree of control exercised by APN over Plaintiff, the Court finds as a matter of law that Plaintiff was not an employee of APN.  In contrast to Plaintiff's relationship with Aetna-AHM, which was characterized by direct and daily supervision, work on Aetna-AHM products, and a conventional workday, Plaintiff's relationship with APN was mutually convenient — APN facilitated

Plaintiff's employment at Aetna-AHM, but neither possessed nor exercised supervisory capacity over Plaintiff, and had no apparent involvement in the substance of Plaintiff's work.  Taking all of these considerations together, the Court finds that Plaintiff has not established an employment relationship with APN under the *Reid* factors sufficient to invoke the protections of Title VII and the NYSHRL.

APN also challenges Plaintiff's alternative arguments that it was either a single integrated entity within Aetna or a joint employer with Aetna.  (APN Br. 13-15).  In short, while each assessment is guided by its own set of relevant factors, as elaborated below, the Court agrees that Plaintiff's positions on both fronts fail for the same general reason:  While APN had some involvement in Plaintiff's employment relationship with Aetna-AHM, that involvement was pursuant to arm's-length contracts between Aetna and APN that belie any conclusion that the two organizations were connected.

In the single integrated entity analysis, the question of whether "two nominally separate entities are actually part of a single integrated enterprise," turns on the degree of interrelationship between the two entities, and is guided by consideration of the same four factors assessed when considering parent-subsidiary liability: (i) interrelation of operations; (ii) centralized control of labor relations; (iii) common management; and (iv) common ownership or financial control.  *Clinton's Ditch Co-op Co.* v. *N.L.R.B.*, 778 F.2d 132, 137 (2d Cir. 1985).  On this record, it is clear that APN is not a single integrated entity within Aetna-AHM.

APN and Aetna-AHM share neither common ownership or financial control (fourth factor), nor common management (third factor).  As to the first two factors, Plaintiff alleges that the involvement of APN in his hiring and termination, coupled with two provisions in the PSA, suggests that APN's operations were interrelated with those of the Aetna defendants.  (Pl. Opp. 2-4).  However, the clear demarcation of responsibilities between APN and Aetna pursuant to the Professional Services Agreement, and the fact that APN did not make the final decision regarding Plaintiff's employment, foreclose any finding of substantial interrelation of operations or centralized control of labor relations.  *See Laurin* v. *Pokoik*, No. 02 Civ. 1938 (LMM), 2004 WL 513999, at *5 (S.D.N.Y. Mar. 15, 2004) ("That an entity does tasks for another does not automatically make the two part of an integrated enterprise.").[8]  Accordingly, the Court finds that APN was not a single integrated entity with Aetna-AHM.

Nor does Plaintiff's alternative assertion that APN should be considered his joint employer fare any better.  In this analysis, the question before the Court is not one of interrelationship, but rather of control.  In particular, a determination that a third-party entity is acting as a joint employer requires "sufficient evidence of immediate control over the employees."  *Clinton's Ditch Co-op Co.*, 778 F.2d at 138; *see Lima* v. *Addeco*, 634 F. Supp. 2d 394, 400

---

[8]    Plaintiff is also mistaken in his assertion that paragraphs 19 and 20 of the PSA suggest that APN was somehow an outsourced entity of Aetna.  Paragraph 19 entitles Aetna to designate one of its outsourced entities to receive services provided by APN.  (PSA ¶ 19).  Similarly, paragraph 20 merely sets out the terms by which APN is authorized to use subcontractors to perform the services in the PSA.  (*Id.* ¶ 20).

(S.D.N.Y. 2009) ("The joint employer doctrine has been applied to temporary employment or staffing agencies and their client entities.").

In the Second Circuit, five factors bear on the joint employer inquiry; they include whether the alleged joint employer (i) did the hiring and firing; (ii) directly administered any disciplinary procedures; (iii) maintained records of hours, handled the payroll, or provided insurance; (iv) directly supervised the employees; or (v) participated in the collective bargaining process. *See AT&T* v. *N.L.R.B.*, 67 F.3d 446, 451 (2d Cir. 1995) (citing *Clinton's Ditch*, 778 F.2d at 138-39), *as clarified on reh'g* (Sept. 29, 1995). Defendants assert that APN exerted no control over Plaintiff, and "merely compensated Karupaiyan Consulting for the contracting services Plaintiff performed for Aetna-AHM." (APN Br. 15). Plaintiff disputes this, arguing that each of the five factors is met. (Pl. Opp. 12-14). After examining each factor, the Court agrees with APN.

*First*, Plaintiff contends that the fact that APN was involved in the hiring and termination of Plaintiff's position at Aetna-AHM means that it did the hiring and firing. (Pl. Opp. 6 (citing Def. 56.1 ¶¶ 16, 20-21, 49)). Not so. To be sure, courts have found joint employer status where "[t]he two entities acted in concert in hiring [a worker] and later in jointly *deliberating* about firing him, thereby both exercise[ed] authority over his continued access to employment." *Farzan* v. *Wells Fargo Bank, N.A.*, No. 12 Civ. 1217 (RJS) (JLC), 2013 WL 6231615, at *16 (S.D.N.Y. Dec. 2, 2013) (emphasis added), *aff'd sub nom. Farzan* v. *Genesis 10*, 619 F. App'x 15 (2d Cir. 2015) (summary order). Here, however, the undisputed facts make clear that APN had no deliberative role

with regard to Plaintiff's employment, and instead merely effectuated the hiring and termination decisions made by Aetna.  (*See* Denner Decl., Ex. B).  As a practical matter, therefore, APN exercised no authority over Plaintiff's continued employment at Aetna-AHM.

*Second*, Plaintiff contends that APN disciplined him "based on [the] SOW between Aetna-AHM and APN."  (Pl. Opp. 7 (citing Def. 56.1 ¶ 50)).  On its face, however, neither the SOW nor the Contractor Agreement contains any disciplinary provisions, nor any suggestion that Aetna-AHM somehow authorized APN to discipline Plaintiff on its behalf.  (*See generally* SOW; Contractor Agreement).  Rather, the SOW contained a termination provision, which Aetna-AHM opted to exercise, thereby triggering the termination provision in the Contractor Agreement.  (*See* Def. 56.1 ¶ 17; SOW; Contractor Agreement).

*Third*, while APN was involved in transmitting payments to Plaintiff for services rendered to Aetna-AHM, it did so pursuant to timesheets prepared by Plaintiff and approved by Aetna-AHM, and exercised no independent discretion on the total that was owed by APN to Plaintiff.  (Def. 56.1 ¶¶ 26-27).  Nor did APN provide insurance to Plaintiff.

*Fourth*, and as discussed extensively above, APN had no role in directly supervising Plaintiff.  Plaintiff visited APN's offices only once to sign the relevant agreements to begin his work at Aetna, and otherwise communicated with APN via email or phone to raise questions about his payment.  (Pl. Decl. ¶ 30; *see, e.g.*, Neela Decl., Ex. A; Pl. Decl., Ex. B, C).  There is also nothing in

the record to suggest that APN had any involvement in supervising Plaintiff's actual work.  *See AT&T*, 67 F.3d at 451-52 (collecting cases finding no joint employer status when there is only limited evidence of supervision).

*Finally*, APN was not involved in the collective bargaining process. Plaintiff asserts that APN was involved in the negotiation of his hourly rate, and therefore that it engaged in collective bargaining with him.  (Pl. Opp. 7-8).  This is not the case, as this component of the analysis stems from labor law, and considers a putative joint employer's involvement in negotiating a collective bargaining agreement.  *See AT&T*, 67 F.3d at 448-49 (examining third party's involvement in a collective bargaining agreement between employer and union to determine if third party is a joint employer).  Here, APN's role in negotiating Plaintiff's rate for services was as an intermediary between Plaintiff and Aetna. (*See* Def. 56.1 ¶ 21).  Considering all factors together, there is nothing about Plaintiff's relationship with APN to suggest that APN exerted immediate control over Plaintiff.  *See AT&T*, 67 F.3d at 452 ("Limited and routine supervision, without an ability to hire, fire, or discipline, cannot justify a finding of joint employer status.").  Therefore, APN cannot be considered a joint employer. More broadly, without the necessary employer-employee relationship, Plaintiff's Title VII and NYSHRL claims against APN must be dismissed.

Given the number of defendants and claims, the Court pauses to recap its determinations regarding Plaintiff's employment relationships.  *First*, Plaintiff has raised a triable issue regarding an employment relationship with Aetna-AHM under *Reid*, a necessary element of Plaintiff's Title VII and NYSHRL

claims.  As such, Defendants' motion for summary judgment on this basis is
denied.  However, Plaintiff's inability to extend that relationship to CVS merits
summary judgment on those claims in favor of CVS.  *Second*, Plaintiff cannot
establish an employment relationship with APN, either under *Reid* or under the
doctrines of single integrated entities and joint employers.  Because of this,
APN is entitled to summary judgment in its favor on Plaintiff's Title VII and
NYSHRL claims.

> **b.   Certain of Plaintiff's Race Discrimination Claims Under
> Title VII, Section 1981, and the NYSHRL May Proceed
> Against Aetna-AHM Alone**

> **i.       Overview of Plaintiff's Claims**

The Court now moves to the merits of Plaintiff's race discrimination
claims brought under Title VII, the NYSHRL, and Section 1981.  For its part,
Aetna-AHM argues that Plaintiff cannot establish that its proffered legitimate,
nondiscriminatory reasons for his failure to receive pay and the termination of
his contract were pretextual.  (*See* CVS Br. 13-20).  As set forth in the
remainder of this section, the Court finds that genuine issues of material fact
exist as to whether Aetna-AHM's stated reasons for the termination of Plaintiff's
contract were pretextual, and thus denies summary judgment as to those
claims.  Conversely, the Court finds that Plaintiff cannot tie his failure to
receive pay to any discrimination.

As established in the preceding section, the Court finds that Plaintiff is
unable to establish an employment relationship with the APN Defendants,
meaning that Plaintiff's Title VII and NYSHRL claims fail on that basis alone.

Even assuming, *arguendo*, that such a relationship existed (which it does not), the Court concludes that Plaintiff cannot demonstrate that APN's proffered nondiscriminatory reasons for his failure to receive pay and for the termination of his contract were pretextual.  (*See* APN Br. 17-19).

Significantly, Plaintiff's Section 1981 claim against APN is not precluded by his failure to establish an employment relationship, as "[c]ourts have held that 'Section 1981 protects not only individual[] [employees] but also independent contractors.'"  *Williams* v. *Pearlstein*, No. 19 Civ. 8104 (CM), 2019 WL 13249535, at *1 (S.D.N.Y. Sept. 6, 2019) (quoting *D'Ambrosio* v. *Bast Hatfield, Inc.*, No. 12 Civ. 1895 (NAM), 2017 WL 6388889, at *7 (N.D.N.Y. Sept. 28, 2017), *aff'd*, 737 F. App'x 44 (2d Cir. 2018) (summary order)).  Even so, the Court finds that summary judgment in warranted in favor of APN on Plaintiff's race discrimination claims, as the undisputed material facts demonstrate that discrimination was not a but-for cause of Plaintiff's failure to receive pay or termination.

### ii.   Applicable Law

Disparate treatment claims under Title VII, Section 1981, and the NYSHRL[9] are analyzed using the three-step burden-shifting framework adopted in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973).  *See Tolbert*, 790 F.3d at 434 (Title VII, NYSHRL, and Section 1981 claims).  Under *McDonnell*

---

[9]     In August 2019, the NYSHRL was amended to broaden its liability standards. *See* N.Y. Exec. Law § 300.  However, the conduct alleged here pre-dates the amendment, which does not have retroactive effect. *See McHenry* v. *Fox News Network, LLC*, 510 F. Supp. 3d 51, 68-69 (S.D.N.Y. 2020).

*Douglas*, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  *See* 411 U.S. at 802.  If the plaintiff does so, the burden shifts to the defendant to articulate "some legitimate, nondiscriminatory reason" for its action.  *Id.*  With respect to a discrimination claim, "once the [employer] has made a showing of a neutral reason for the complained of action, to defeat summary judgment ... the [employee's] admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the [employer's] employment decision was more likely than not based in whole or in part on discrimination."  *Terry* v. *Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (internal quotation marks omitted).

While each set of claims is evaluated under the same framework, the standard for establishing discrimination is different.  To make out a successful claim under Title VII and the NYSHRL, a plaintiff is not "required to prove the prohibited motivation was the sole or even the principal factor in the decision, or that the employer's proffered reasons played no role in the employment decision."  *Finn* v. *N.Y. State Off. of Mental Health-Rockland Psychiatric Ctr.*, No. 08 Civ. 5142 (VSB), 2011 WL 4639827, at *11 (S.D.N.Y. Oct. 6, 2011) (citing *Holtz*, 258 F.3d at 78).  Rather, a plaintiff may allege a mixed-motive claim, in which he must only show "that those [proffered reasons] were not the only reasons and that [the] plaintiff's protected status contributed to the employer's decision."  *Id.*

Section 1981 sets a higher bar.  In particular, a plaintiff must plausibly allege that "*but for* race, [he] would not have suffered the loss of a legally

protected right." *Comcast Corp* v. *Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) (emphasis added). Importantly, mixed-motive claims that would succeed under Title VII and the NYSHRL necessarily fall short under Section 1981, as "it is insufficient to merely plead that race was a motivating factor in the discriminatory action." *Brown* v. *Montefiore Med. Ctr.*, No. 19 Civ. 11474 (ALC), 2021 WL 1163797, at *5 (S.D.N.Y. Mar. 25, 2021) (citing *Comcast Corp.*, 140 S. Ct. at 1017-18).

### iii. Genuine Disputes of Material Fact Preclude Summary Judgment on Plaintiff's Discriminatory Termination Claim Against Aetna-AHM

The Court first addresses Plaintiff's claims against Aetna-AHM, and then considers those against APN. Broadly speaking, Plaintiff asserts two sets of race discrimination claims against Aetna-AHM, the first related to his failure to receive pay, and the second arising out of the termination of his employment.

As an initial matter, Aetna-AHM does not dispute that Plaintiff has made out his *prima facie* case against it for either claim. (CVS Br. 13, 17-18). Plaintiff is of Indian origin and has "dark/black" skin; Plaintiff's experience as a software engineer rendered him qualified for his position; and Plaintiff's alleged failure to receive pay and ultimate termination could qualify as adverse employment actions. (Def. 56.1 ¶¶ 2, 21). *See Karupaiyan I*, 2021 WL 4341132, at *11-13 (finding that both actions would satisfy the requirements for a *prima facie* case). Nor does Aetna-AHM dispute that Kalyani's alleged remarks, if made, would give rise to an inference of race discrimination. Instead, Aetna-AHM seeks to rebut Plaintiff's allegations at steps two and three

of the *McDonnell Douglas* analysis.  Because Plaintiff's claims for failure to receive pay and discriminatory termination are resolved differently in this Opinion, the Court addresses them separately.

As a legitimate, nondiscriminatory reason for Plaintiff's failure to receive pay, Aetna-AHM asserts that it complied with all of the relevant payment provisions of the parties' agreements, and that any failure to receive pay was due to Plaintiff's unannounced change of address.  (*See* CVS Br. 14-15 (citing Def. 56.1 ¶¶ 5-18, 23-39, 41-45, 57-67)).[10]  This reason is sufficient to shift the burden back to Plaintiff to either establish that these reasons were pretextual or prove the existence of an additional discriminatory motive that played a role in the decision.

Plaintiff attempts to establish that Aetna-AHM's actions were pretextual by alleging that Aetna-AHM knew of his eviction and mailed payments to the Edison address nonetheless, knowing that they would not be received.  (Pl. Opp. 17-19 (citing Def. 56.1 ¶¶ 56-67)).  In support of this allegation, however, Plaintiff relies on statements allegedly made to him by Neela and Vedant Pathak — both APN employees — in which he was called a "black Madrasi"

---

[10]     Plaintiff's attempts to dispute that these payments were actually made rely on conclusory allegations that because Plaintiff did not see the checks with his own eyes, and because APN did not provide photographs of the checks in evidence, there is no evidence payment was made.  (*See* Pl. 56.1 ¶ 57).  Such efforts fail under the caselaw. *See Jeffreys* v. *City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) ("To defeat summary judgment, therefore, nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" (quoting *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *see also Vasquez* v. *Warren*, 630 F. Supp. 3d 524, 535 (S.D.N.Y. 2022) ("*Pro se* status does not, however, excuse a *pro se* litigant from making the showing required to defeat summary judgment; he or she must offer more than bald assertions, completely unsupported by evidence to overcome the motion." (internal quotation marks and citation omitted)).

when he asked about his payment.  (*Id.* at 19 (citing Def. 56.1 ¶ 75)).  Unable

to provide evidence of pretext, Plaintiff's claims against Aetna-AHM based on

his failure to receive pay cannot proceed, nor can similar claims brought

against Kalyani in her individual capacity.

 With respect to Plaintiff's termination, Aetna-AHM argues that Plaintiff's

contract with it terminated according to its race-neutral terms, and that the

decision to terminate Plaintiff was driven by his poor performance.  (CVS

Br. 18).  To substantiate this assertion, Defendants rely on the affidavit of

Kalyani, who states that the decision to terminate Plaintiff's engagement "was

based, in large part, on [Plaintiff's] inability to complete the tasks [Plaintiff] was

engaged to perform and unprofessional behavior in the workplace, such as

initiating disruptive political conversations, falling asleep during work hours,

and not paying attention during meetings."  (*Id.* (citing Def. 56.1 ¶ 50)).  These

reasons suffice under step two of the *McDonnell Douglas* analysis.  *See Cross* v.

*N.Y.C. Transit Auth.*, 417 F.3d 241, 250 (2d Cir. 2005) (noting that a failure to

"perform satisfactorily" is a legitimate, nondiscriminatory reason for dismissal).

And while Plaintiff disputes these assertions, he identifies no record evidence

substantiating his belief that these reasons are incorrect, nor has the Court

identified any such evidence in its own thorough review of the record.  *See*

*Hartley* v. *Rubio*, 785 F. Supp. 2d 165, 180 (S.D.N.Y. 2011) ("[A plaintiff] must

offer more than self-serving and conclusory allegations that the defendants'

proffered reasons were false.").  Therefore, the Court accepts Aetna-AHM's

proffered legitimate, nondiscriminatory reasons, and the burden shifts to Plaintiff to establish pretext.

On the issue of pretext, Plaintiff relies on two comments allegedly made by Kalyani: *first*, her reference to him as a "black apple," and *second*, her directive to "kick the old black Madrasi out" at the time of his termination. Defendants argue that even if such remarks were made, neither is sufficient to create a triable issue that Plaintiff's termination was motivated, even in part, by discrimination. (CVS Br. 19). The Court accepts Plaintiff's allegations about Kalyani's statements as true, as it must in this context, and considers whether they are sufficiently probative of discriminatory intent to establish pretext. *See Fincher* v. *Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) ("Although a jury might believe the defendants and disbelieve the plaintiff, we cannot wholly dismiss one of the defendant's alleged [discriminatory] comments at the summary judgment stage." (internal quotation marks and citation omitted, alteration adopted)).

To do so, the Court follows a four-factor test established by the Second Circuit to determine whether purportedly offensive statements suggest discriminatory bias or are merely "stray remarks" that generally "do not constitute sufficient evidence to make out a case of employment discrimination." *Danzer* v. *Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998). The test considers:

> [i] who made the remark (*i.e.*, a decision-maker, a supervisor, or a low-level co-worker); [ii] when the remark was made in relation to the employment

> decision at issue; [iii] the content of the remark (*i.e.*, whether a reasonable juror could view the remark as discriminatory); and [iv] the context in which the remark was made (*i.e.*, whether it was related to the decision-making process).

*Henry* v. *Wyeth Pharms., Inc.*, 616 F.3d 134, 150-51 (2d Cir. 2010).  The Second Circuit has cautioned against categorical application of this analysis, noting that its purpose "[is] to recognize that all comments pertaining to a protected class are not equally probative of discrimination … [and] not [] to suggest that remarks should first be categorized either a stray or not stray and then disregarded if they fall into the stray category."  *Tomassi* v. *Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115-16 (2d Cir. 2007).

It is worth noting, as Aetna-AHM acknowledges, that this Court conducted a similar analysis at the motion to dismiss stage.  *See Karupaiyan I*, 2021 WL 4341132, at *12-13.  There, this Court found the "black apple" remark to be stray in light of its lack of nexus to any adverse employment decision.  This conclusion is no different in light of the evidence adduced during discovery.  Next, this Court found that the "black old Madrasi" remark was not a stray remark, and that it could plausibly support an inference that Plaintiff's termination was related to his race.  *See id.* at *13.  As Plaintiff is entitled to rely on elements of his *prima facie* case to establish pretext, the Court considers whether Defendants have adduced additional facts in discovery to change the Court's prior analysis as to the "black old Madrasi" comment, and ultimately concludes that they have not.

The undisputed facts indicate that Kalyani was Plaintiff's direct supervisor, and also one of two decisionmakers regarding Plaintiff's termination.  (See Kalyani Decl. ¶¶ 2-3).  Plaintiff avers, and Defendants do not dispute, that the remark, which references his termination, was made to Plaintiff on the date he was terminated.  (Def. 56.1 ¶ 75; Pl. Dep. 97:20-98:2).  Finally, the content of the remark is apparently racially charged to a degree that warrants consideration by a jury.[11]  Assessing these facts as a whole and resolving all inferences in Plaintiff's favor, the Court cannot find, as a matter of law, that Kalyani's utterance of this remark is insufficient to prove pretext.  *See Tolbert*, 790 F.3d at 437 (finding summary judgment inappropriate where "the remarks were made by the *de facto* decisionmaker, [and] the remarks clearly suggest racial bias"); *Henry*, 616 F.3d at 149-50 ("The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be." (internal quotation marks and citation omitted)).

---

[11]     While the term "Madrasi" in this context is unfamiliar to the Court, its use with the descriptor "black," coupled with Plaintiff's testimony that it is a slur referencing the color of his skin, is sufficient to suggest that it rises above the level of an innocuous remark, and is instead "a disputed factual issue as to which the nonmovant's (plausible) interpretation must, at summary judgment, be accepted."  *Danzer* v. *Norden Sys., Inc.*, 151 F.3d 50, 54 (2d Cir. 1998).  (*See* Pl. Dep. 82:12-14 ("I'm from [] South India....  South India[n] people [have] dark skin, so normally they call them [M]adrasi.")).  Nor do Defendants suggest that the Court should interpret the content of the remark as innocuous.  Indeed, in another case brought by Plaintiff to protest the impounding of his car, the Third Circuit assumed *arguendo* that the term was a slur, but affirmed the dismissal of Plaintiff's complaint nonetheless after concluding that "an officer's isolated use of a racial slur or epithet by itself — reprehensible though it is — does not violate the Constitution."  *Karupaiyan* v. *Twp. of Woodbridge*, No. 21-3339, 2022 WL 1315085, at *2 (3d Cir. May 3, 2022), *cert. denied sub nom. Karupaiyan* v. *Twp. of Woodbridge, New Jersey*, 143 S. Ct. 235 (2022), *reh'g denied*, 143 S. Ct. 518 (2022).

The significance of the "old black Madrasi" comment in proving Kalyani had a discriminatory motive when terminating Plaintiff's contract must be decided by a jury. *See Danzer*, 151 F.3d at 57 ("Since the defendant will rarely admit to having said or done what is alleged, and since third-party witnesses are by no means always available, the issue frequently becomes one of assessing the credibility of the parties."); *Fincher*, 604 F.3d at 726 ("Whether [defendants] had a private conversation in which [defendant] made the remarks that [plaintiff] imputes to him is a question of 'he said, she said,' on which the court cannot, in the context of this case, take a side at the summary judgment stage." (citation omitted)).  And if the comment is understood by the jury to be probative of discriminatory intent, it is the role of the jury to determine its significance (or not) in the decisionmaking process — namely, if it can establish that discriminatory intent was one of many factors in the decision to terminate Plaintiff's contract, which would be sufficient for liability under Title VII and the NYSHRL, or that it was the but-for cause of the decision, which would be sufficient for liability under Title VII, the NYSHRL, and Section 1981.  For this reason, the Court denies Aetna-AHM's motion for summary judgment as to Plaintiff's Title VII, NYSHRL, and Section 1981 claims regarding his termination.

The Court must also consider Plaintiff's related Section 1981 and NYSHRL claims against Kalyani.  Both statutes allow for individual liability where the actor was personally or directly involved in the violation.  *See Tardd* v. *Brookhaven Nat'l Lab'y*, 407 F. Supp. 2d 404, 411-12 (E.D.N.Y. 2006)

(finding that Section 1981 permits individual liability where there exists "some affirmative link to causally connect the actor with the discriminatory action" (quoting *Whidbee* v. *Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000))); *see also Feingold* v. *New York*, 366 F.3d 138, 157 (2d Cir. 2004) (finding that a supervisor can be held individually liable under the NYSHRL if she "actually participates in the conduct giving rise to [the] discrimination" (quoting *Tomka* v. *Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995))).  Here, it is undisputed that Kalyani was Plaintiff's supervisor; that she allegedly made the discriminatory remarks to Plaintiff; and that she was one of two decisionmakers in terminating Plaintiff's contract.  Therefore, the Court finds that Plaintiff's Section 1981 and NYSHRL claims can proceed against Kalyani.

### iv.  Summary Judgment as to Plaintiff's Race Discrimination Claims Is Warranted as to APN

In a reprise of its belt-and-suspenders approach to Plaintiff's claims, the Court applies the same *McDonnell Douglas* framework to Plaintiff's race discrimination claims against APN despite its earlier findings regarding the absence of an employment relationship between APN and Plaintiff.  On the merits of Plaintiff's claims, APN argues that Plaintiff cannot make out his *prima facie* case, and alternatively that he cannot demonstrate that APN's legitimate nondiscriminatory reasons for Plaintiff's failure to receive pay and termination of his contract were pretextual.  (*See* APN Br. 17-19).  As discussed below, the Court accepts the latter argument, and concludes that Plaintiff cannot adduce sufficient facts for a reasonable finder of fact to conclude that outcome was in any way motivated by Plaintiff's race.

The Court begins by considering the sufficiency of Plaintiff's *prima facie* case against APN.  Neither party disputes that Plaintiff belongs to a protected group, that he was qualified for his position, and that termination of his contract and failure to receive pay could be considered adverse employment actions.  (*See* APN Br. 17).  Instead, APN disputes the fourth element, arguing the termination of Plaintiff's agreement did not occur under circumstances giving rise to an inference of discrimination, and instead merely ended in accordance with its terms.  (*See id.* (citing Def. 56.1 ¶ 49)).

While the Court agrees that Plaintiff's claims against APN must ultimately be dismissed, it remains unconvinced by APN's argument that Plaintiff's account of the events does not suggest circumstances giving rise to an inference of discriminatory animus.  Among other evidence, Plaintiff proffers testimony of conversations with Vedant Pathak, the owner, founder, and CEO of APN, and with Neela Pathak, a Director at APN, in which both used the same "Madrasi" epithet against him in conversations about his pay.  (*See, e.g.*, Pl. Dep. 195:12-196:16).  Defendants suggest that this testimony should not be credited, as it consists solely of "self-serving statements [made] during [Plaintiff's] deposition."  (APN Br. 17).  However, "[t]here is nothing in [Rule 56] to suggest that nonmovants' [sworn testimony] alone cannot — as a matter of law — suffice to defend against a motion for summary judgment."  *Danzer*, 151 F.3d at 57.  Plaintiff's testimony that Vedant and Neela Pathak made these comments to him is not a conclusory reference to actions outside of his own direct observation.  (Pl. Dep. 195:12-196:10).  *See Fincher*, 604 F.3d at 726

(recognizing that a plaintiff's direct testimony can be sufficient to survive summary judgment, where it is "not contradictory or rife with inconsistencies such that it was facially implausible").

With Plaintiff's *prima facie* case satisfied, the Court recognizes two legitimate, nondiscriminatory reasons proffered by Defendants for Plaintiff's adverse employment actions. *First*, Plaintiff's failure to receive pay was due to Plaintiff's change in address, which meant that payments sent by APN pursuant to the Contractor Agreement could not be delivered. (CVS Br. 14 (citing Def. 56.1 ¶ 57-64)). *Second*, APN's termination of Plaintiff's Contractor Agreement occurred as a matter of course after Aetna-AHM terminated Plaintiff's SOW. (APN Br. 17).

Plaintiff raises a number of arguments in response, none of which suffices to overcome APN's legitimate, nondiscriminatory reasons. Most salient are those arguments referencing Vedant and Neela Pathak's alleged comments, similar to the one ascribed to Kalyani, referring to Plaintiff as the "old black Madrasi," including when he asked APN to be paid for the work he had done. (Pl. Opp. 15, 24 (citing Def. 56.1 ¶ 75)). Without passing on whether these remarks can be considered stray, the Court instead finds that, even assuming they have some probative value, they cannot establish that "discrimination was the real reason for [either] employment action." *Forte* v. *Liquidnet Holdings, Inc.*, 675 F. App'x 21, 25-26 (2d Cir. 2017) (summary order) (internal quotation marks and citation omitted, alteration adopted).

To begin, the undisputed facts demonstrate that APN timely sent payment to Plaintiff based on the terms of the Contractor Agreement for the months of June, July, and August, and for the two-week notice period.  (Def. 56.1 ¶¶ 57-64).  This alone belies Plaintiff's assertions that either Pathak's comments evidenced an intent to delay or withhold his payments.  Plaintiff's follow-up theory, that APN's reliance on the payment provisions in the Agreement was discriminatory because of its contemporaneous knowledge of his eviction, is far too attenuated to meet his burden at summary judgment.  *See Jeffreys*, 426 F.3d at 554 ("[S]ummary judgment cannot be defeated 'on the basis of conjecture or surmise.'" (quoting *Trans Sport, Inc.* v. *Starter Sportswear, Inc.*, 964 F.2d 186, 188 (2d Cir. 1992))).

Nor can the emails provided by Plaintiff in which he requests expedited, direct deposit of his salary payments support this theory.  (*See* Pl. Decl., Ex. B, C).  While these emails suggest that Plaintiff may have been experiencing financial difficulties, they say nothing about his continued ability to receive mail at the Cinder Road address, as dictated by the terms of the Consulting Agreement.  In fact, Plaintiff's first email suggests only that he "ha[d] some postbox key problem," which is a far cry from eviction.  (*See id.*, Ex. B).  Faced with what is, at best, "contradictory and incomplete testimony," the Court cannot credit Plaintiff's theory for the purposes of summary judgment.  *Jeffreys*, 426 F.3d at 554.[12]

---

[12]    Even crediting Plaintiff's dubious argument that his emails put Neela Pathak on notice that he was having difficulties receiving payment, her email to Plaintiff on October 23, 2019, informing him that the checks had not been delivered and asking him to inform

APN also asserts, and the Court also agrees, that the undisputed facts demonstrate that the termination of its Contractor Agreement with Plaintiff automatically followed the termination of Plaintiff's SOW with Aetna-AHM and could therefore not have been motivated by race. (APN Br. 17-18). To review, Section Five of the Contractor Agreement expressly provides that "[i]n the event that Aetna reasonably determines that an employee of Supplier is not performing in a proper professional, workmanlike and satisfactory manner, then Supplier shall discontinue using that employee in the performance of the Services hereunder." (Contractor Agreement ¶ 5). Similarly, the Fee Schedule provides that "[o]nce Client determines the Project is completed, the Contractor Service Agreement will terminate unless otherwise agreed." (Fee Schedule 2). Once Aetna-AHM decided to terminate the SOW governing Plaintiff's work, Plaintiff's Contractor Agreement with APN concluded automatically. (Def. 56.1 ¶¶ 49-50). Put somewhat differently, even if the comments by Vedant and Neela Pathak had some probative value, the automatic operation of the termination clause of the Contractor Agreement following Aetna-AHM's decision to terminate the SOW left APN with no discretion or role in the decisionmaking process to exercise any such bias. *Cf. Daniel* v. *T & M Prot. Res. LLC*, 87 F. Supp. 3d 621 (S.D.N.Y. 2015) (finding that supervisor's discriminatory comments did not play a role in plaintiff's termination, where decision was made by five-member disciplinary committee comprised of supervisor and four

---

APN of how he would like to receive payment, demonstrates APN's intent to make timely payment. (*See* Neela Decl. ¶¶ 2-6 & Ex. A).

others), *vacated and remanded on other grounds*, 689 F. App'x 1 (2d Cir. 2017) (summary order).

Ultimately, the Court concludes that no reasonable jury could find that race discrimination on the part of APN was either a motivating factor in, or the but-for cause of, Plaintiff's failure to receive pay or termination. As such, Plaintiff's claims for race discrimination against APN and its employees under Title VII, Section 1981, and the NYSHRL cannot proceed.

### c.    Certain of Plaintiff's Race Discrimination Claims Under the NYCHRL May Proceed Against Aetna-AHM Alone

As a final category of race discrimination claims, the Court considers Plaintiff's claims under the NYCHRL. *See Loeffler* v. *Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (holding that NYCHRL claims must be reviewed "independently from and 'more liberally' than their federal and state counterparts" (quoting *Williams* v. *N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 31 (1st Dep't 2009))); *see also Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (noting that courts must "constru[e] the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible'" (quoting *Albunio* v. *City of N.Y.*, 16 N.Y.3d 472, 477-78 (2011))).

This separate analysis is necessary because even if the challenged conduct were not actionable under Title VII, the NYSHRL, or Section 1981, it may nonetheless be "actionable under the broader [NYCHRL]." *Mihalik*, 715 F.3d at 109. Of note, the NYCHRL is broader in two respects: *first*, its protections encompass independent contractors as well as employees, and

*second*, it presents a lower bar to a plaintiff seeking to bring a case, requiring only that the plaintiff "show differential treatment — that [he or she] was treated 'less well' — because of a discriminatory intent." *Id.* at 110.

Consistent with its analysis above, the Court begins by considering the employment relationships between Plaintiff and Aetna-AHM and between Plaintiff and APN. The NYCHRL makes it unlawful "[f]or an employer or an employee or agent thereof, because of the [race] of any person: … to refuse to hire or employ or to bar or to discharge from employment such person; or to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a). During the relevant time period, the NYCHRL covered independent contractors under certain circumstances, namely, "natural persons employed as independent contractors to carry out work in furtherance of an employer's business enterprise who are not themselves employers." *Id.* § 8-102(5).[13]

Because Plaintiff has identified a triable issue regarding his employment relationship with Aetna-AHM sufficient to maintain his Title VII and NYSHRL claims, he can likewise pursue his analogous claim under the NYCHRL. *See Farmer* v. *Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 321 (S.D.N.Y. 2020) (applying *Reid* to NYCHRL claims).[14] The sole case proffered by Aetna-AHM in

---

[13]    Effective January 2020, the NYCHRL was amended to cover "interns, freelancers, and independent contractors," with the latter category no longer subject to the limitation that the worker be a "natural person[]." N.Y.C. Admin. Code § 8-107(23).

[14]    Conversely, Plaintiff has established no basis to extend liability to CVS, as the analysis for parent-subsidiary liability under the NYCHRL is the same as that under the NYSHRL, discussed above. *See McHenry*, 510 F. Supp. 3d at 80 (applying single-employer doctrine to claims under NYSHRL and NYCHRL (citation omitted)). This

opposition, *Hopper* v. *Banana Republic, LLC*, No. 07 Civ. 8526 (WHP), 2008 WL 490613, at *3 (S.D.N.Y. Feb. 25, 2008), does not require a different outcome. (*See* CVS Br. 8).

In *Hopper*, the district court held that the NYCHRL expressly excludes independent contractors, such as Plaintiff, whose contracts were entered into via an LLC. Importantly, the *Hopper* court reached this conclusion only after determining that Plaintiff was not an employee under the factors laid out in *Reid*. The same conclusion was reached more recently by the court in *Smith* v. *Calypso Charter Cruises Inc.*, No. 19 Civ. 7076 (PAE), 2021 WL 4084182 (S.D.N.Y. Sept. 8, 2021), which first considered whether the plaintiff was an employee under *Reid* and, only after determining that he was not, found the plaintiff's employment under an LLC (even in his own name) to preclude coverage under the NYCHRL. The key difference here is that this Court has applied the *Reid* test and found that Plaintiff *has* raised a triable issue under *Reid* concerning his employment relationship with Aetna-AHM, such that Plaintiff's work for Aetna-AHM is potentially covered by the NYCHRL provisions protecting employees.

Turning to APN, where the Court found no employment relationship under *Reid*, the conclusions of *Hopper* and *Calypso Charter* apply with even greater force. Plaintiff contracted with APN via Karupaiyan Consulting, a firm apparently directed by him and his sister, and all payments were made to

---

conclusion is the same for Plaintiff's hostile work environment and age discrimination claims under the NYCHRL, which are discussed *infra*.

Karupaiyan Consulting LLC, rather than to Plaintiff personally. (*See* Def. 56.1 ¶¶ 58-63). The NYCHRL at the time covered independent contractors only to the extent that such workers were "*natural persons* employed as independent contractors to carry out work in furtherance of an employer's business enterprise who are not themselves employers." *Calypso Charter*, 2021 WL 4084182, at *5 (quoting N.Y.C. Admin. Code § 8-102(5)) (emphasis added). Such an arrangement, therefore, places Plaintiff outside the scope of the NYCHRL, as "[c]ourts in this District have read this provision to preclude claims brought by workers who were hired by third parties via an entity like an LLC." *Id.* at *12 (collecting cases). The Court accordingly holds that Plaintiff's race discrimination claims under the NYCHRL against APN, Vedant Pathak, and Neela Pathak fall outside the scope of that statute and must be dismissed.

Turning to the remaining elements of Plaintiff's race discrimination claim, the inquiry under the NYCHRL is "simplified": "the plaintiff need only show that [his] employer treated [him] less well, at least in part for a discriminatory reason." *Mihalik*, 715 F.3d at 110 n.8. Then, "[t]he employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that discrimination played no role in its actions." *Id.* (internal quotation marks omitted and alteration adopted); *accord Fitchett* v. *City of New York*, No. 18 Civ. 8144 (PAE), 2021 WL 964972, at *11 (S.D.N.Y. Mar. 15, 2021); *see also Melman* v. *Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 30-31 (1st Dep't 2012) (noting the

applicability of *McDonnell Douglas* framework in analyzing discrimination claims under the NYCHRL).

Given the Court's conclusion that Plaintiff can advance his wrongful termination claim against Aetna-AHM under the more restrictive federal and state standards, it follows, as to Plaintiff's NYCHRL claim, that there is sufficient evidence on which a reasonable jury could find that Plaintiff was treated less well because of his race.  *See Simmons* v. *Akin Grump Strauss Hauer & Field, LLP*, 508 F. App'x 10, 14 (2d Cir. 2013); *Bennett* v. *Health Mgmt. Sys., Inc.*, 936 N.Y.S.2d 112, 123 (1st Dep't 2011).  Additionally, in light of the NYCHRL's "broader basis for direct individual liability than the NYSHRL," Plaintiff's claims against Kalyani may also proceed.  *Malena* v. *Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 366 (S.D.N.Y. 2012); *see also Schanfield* v. *Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 344 (S.D.N.Y. 2009) ("A claim for aider and abettor liability is also cognizable under the NYCHRL.").

Conversely, the Court's conclusion under Title VII, Section 1981, and the NYCHRL that Plaintiff cannot proffer facts sufficient to make out a claim for failure to receive pay holds true here as well, even under the more permissive NYCHRL standard, as the undisputed facts demonstrate that discrimination played no role in Plaintiff's failure to receive his paychecks.  Nor can Plaintiff's claims against APN prevail, as Plaintiff cannot point to any evidence that a discriminatory motive tainted APN's compliance with the payment terms of the Contractor Agreement, or brought about the automatic termination of that Agreement following the termination of Plaintiff's SOW.

In sum, the Court grants summary judgment as to most, but not all, of Plaintiff's race discrimination claims against Defendants.  In particular, all Defendants are entitled to summary judgment with respect to Plaintiff's Title VII, Section 1981, NYSHRL, and NYCHRL claims alleging failure to receive pay. The APN Defendants are also entitled to summary judgment with respect to Plaintiff's Title VII, Section 1981, NYSHRL, and NYCHRL claims alleging discriminatory termination.  By contrast, summary judgment is inappropriate with respect to Plaintiff's discriminatory termination claims under Title VII, Section 1981, the NYSHRL, and the NYCHRL against Aetna-AHM and Kalyani, in light of genuine disputes of material fact.

## C.     Certain of Plaintiff's Hostile Work Environment Claims Under the NYCHRL Survive Summary Judgment

The Court next considers Plaintiff's claims under the NYCHRL for hostile work environment based on his race, brought against Aetna-AHM and APN. Because "[t]he NYCHRL does not differentiate between [hostile work environment] and discrimination claims," the Court's analysis and conclusions largely track those reached regarding Plaintiff's NYCHRL discrimination claims. *Milord-Francois* v. *New York State Off. of Medicaid Inspector Gen.*, 635 F. Supp. 3d 308, 330 (S.D.N.Y. 2022).

The crux of Plaintiff's hostile work environment claim against Aetna-AHM rests on the aforementioned racist remarks allegedly made by Kalyani, his supervisor.  Courts applying the broad standard of the NYCHRL have found that "even 'a single comment' may be actionable in appropriate circumstances." *Mihalik*, 715 F.3d at 114 (quoting *Williams*, 872 N.Y.S.2d at 40-41 & n.30).

And unlike in the discriminatory termination context, Kalyani's alleged "black apple" remark, made to Plaintiff in the workplace, in front of another coworker, is considered in assessing his hostile work environment claim.

To rebut the significance of these comments, Defendants rely on the same arguments made when addressing Plaintiff's discrimination claims — that Plaintiff's self-serving testimony is insufficient to support his claims regarding those statements.  (*See* CVS Br. 15).  As noted above, Plaintiff's testimony recounting Kalyani's comments made to him is indeed sufficient to withstand summary judgment, and the significance of these comments is one for the jury to determine.  *Mihalik*, 715 F.3d at 111 (remarking that summary judgment is inappropriate where defendants cannot establish that a case is "truly insubstantial," such that the defense is clear as a matter of law).

Plaintiff's hostile work environment claims under the NYCHRL against Aetna-AHM and Kalyani may therefore proceed.  Conversely, summary judgment in favor of the APN Defendants as to these claims is appropriate in light of Plaintiff's independent contractor relationship, and those claims must therefore be dismissed.

### D.    Summary Judgment Is Warranted as to Plaintiff's Age Discrimination Claims Under the NYCHRL

Plaintiff also alleges age discrimination under the NYCHRL against Aetna-AHM and APN.  In particular, Plaintiff claims that Defendants discriminated against him by terminating his contract and replacing him with a younger employee.  (Pl. Opp. 24; Def. 56.1 ¶ 79).  Defendants respond that, even under the NYCHRL, Plaintiff cannot raise a triable issue as to whether age

discrimination was a motivating factor for any adverse action. (CVS Br. 22). For the reasons that follow, the Court agrees, and grants summary judgment in favor of Defendants.

As a threshold matter, Plaintiff's NYCHRL age discrimination claims against the APN Defendants, like his race discrimination claims, must be dismissed in light of his independent contractor relationship. However, because Plaintiff has identified a triable issue regarding his employment relationship with Aetna-AHM, his claims against that entity are not barred on that basis. Instead, the Court assesses these claims under the "simplified [] discrimination inquiry," in which the "plaintiff need only show that [his] employer treated [him] less well, at least in part for a discriminatory reason." *Mihalik*, 715 F.3d at 110 n.8.

As noted, on summary judgment, "[t]he employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that 'discrimination played no role' in its actions." *Mihalik*, 715 F.3d at 110 n.8 (quoting *Williams*, 872 N.Y.S.2d at 40 n.27 (alteration adopted)). In other words, to prevail on a summary judgment motion under the NYCHRL, the employer is "required to meet its burden of showing that, based on the evidence before the court and drawing all reasonable inferences in [plaintiff's] favor, no jury could find that the [defendant] treated [the plaintiff] 'less well' than other employees at least in part because of her race." *Simmons*, 508 F. App'x at 13.

Even considering Plaintiff's claim under the more lenient "mixed-motive" framework of the NYCHRL, in which a plaintiff may prevail if "he or she proves that unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor, for an adverse employment decision," the Court finds that Plaintiff's age discrimination claims do not pass muster.  *See Melman*, 946 N.Y.S.2d at 40.  For starters, Defendants dispute the factual basis for Plaintiff's allegation that he was replaced by a "recent college grad" (Def. 56.1 ¶¶ 79-80), and to that end proffer testimony by Kalyani and Denner that the individual employee identified by Plaintiff was in fact hired as a Junior Software Engineer several weeks before Plaintiff's engagement was terminated, and was not a replacement for Plaintiff (Kalyani Decl. ¶ 8; Denner Decl. ¶ 16). In light of the undisputed testimony from individuals responsible for hiring the employee, the Court can no longer credit Plaintiff's unfounded belief that the employee was his replacement.

Next, Defendants dispute the significance of Kalyani's "old black Madrasi" remark as evidence of discriminatory intent regarding Plaintiff's age. In point of fact, Kalyani's use of the term "old" carries far less weight in proving age discrimination, than does her use of "black Madrasi" in proving race discrimination.  *See Lent* v. *City of New York*, 175 N.Y.S.3d 525, 526 (2022) (finding "[t]he alleged stray remark by [plaintiff's supervisor] that plaintiff was 'old enough to retire' did not, without more, give rise to an inference of ageist bias" (citations omitted)); *see also Fincher*, 604 F.3d at 726 ("Summary judgment cannot be defeated by the presentation by the plaintiff of but a

'scintilla of evidence' supporting her claim." (quoting *Anderson*, 477 U.S. at 252)).  While such a remark, when combined with the allegation about Plaintiff's replacement, may have been sufficient to survive a motion to dismiss, the Court can no longer find the remark, shorn of evidentiary support, to be sufficiently probative of discriminatory intent to withstand summary judgment.

Finally, even assuming that Plaintiff could make out a covered independent contractor relationship with APN, which he cannot, the Court again finds, as a matter of law, that his failure to receive pay and his termination are in no way due to age discrimination.  The Court therefore grants summary judgment in favor of all Defendants as to Plaintiff's NYCHRL age discrimination claims.

### E.    Summary Judgment Is Warranted as to Plaintiff's Failure to Accommodate Disability Claims Under the ADA, the NYSHRL, and the NYCHRL

The Court turns now to Plaintiff's allegations that Aetna-AHM and APN failed to accommodate his disability.  In particular, Plaintiff alleges that his situs inversus totalis condition was aggravated by dust in the Aetna-AHM workplace and that his requests for his desk to be moved were denied.  (Pl. Opp. 26-29; Def. 56.1 ¶ 81).  Defendants rejoin that the undisputed facts — including Plaintiff's medical records — demonstrate that Plaintiff's situs inversus totalis had no respiratory manifestations, such that Plaintiff cannot make out a *prima facie* case.  (*See* CVS Br. 23-24).  The Court agrees, and thus grants summary judgment in favor of all Defendants as to this category of claims.

As in the anti-discrimination context, the protections provided by the ADA and the NYSHRL extend only to employees and not independent contractors. *See Calypso Charter Cruises Inc.*, 2021 WL 4084182, at *7 (collecting cases). For this analysis, courts apply the same common-law agency test laid out in *Reid*. *See id.* at *8 (applying *Reid* to ADA, NYSHRL, and NYCHRL disability claims). As such, this Court's earlier conclusions regarding the employment relationships between Plaintiff and Aetna-AHM, and between Plaintiff and APN, remain the same. To review: (i) Plaintiff *is possibly* an employee of Aetna-AHM; and (ii) Plaintiff *is not* an employee of APN, nor a covered independent contractor for the purposes of the NYCHRL. These conclusions require dismissal of Plaintiff's failure to accommodate claims against the APN Defendants.

A plaintiff states a *prima facie* failure to accommodate claim by alleging that:

> [i] [he] is a person with a disability under the meaning of the [relevant statute]; [ii] an employer covered by the statute had notice of his disability; [iii] with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and [iv] the employer has refused to make such accommodations.

*Rodal* v. *Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004) (ADA); *see also Vangas* v. *Montefiore Med. Ctr.*, 6 F. Supp. 3d 400, 412 (S.D.N.Y. 2014) (NYSHRL and NYCHRL). A qualifying disability is defined more broadly under the NYSHRL and the NYCHRL than it is under Title VII or the ADA. *Compare* N.Y.C. Admin. Code § 8-102 (defining "disability" as "any physical, medical, mental or psychological impairment, or a history or record of

such impairment"), *with* 42 U.S.C. § 12102 (defining "disability" under the

ADA, in relevant part, as "a physical or mental impairment that substantially

limits one or more major life activities of such individual"); *see also Burton* v.

*Metro. Transp. Auth.*, 244 F. Supp. 2d 252, 258 (S.D.N.Y. 2003) ("[I]t is well-

settled that the NYSHRL definition of disability is broader than the federal

definition.").

Aetna-AHM contends that Plaintiff cannot make out the first, most

important element of his *prima facie* case: that he has a disability affecting his

lungs. (CVS Br. 24). It is undisputed that Plaintiff has situs inversus totalis, a

genetic condition in which the organs of the body are the mirror image of

normal anatomy. (Def. 56.1 ¶ 3). Still, Aetna-AHM points to the absence of

record evidence that Plaintiff's condition has any effect on his respiratory

health or abilities. (*See* CVS Br. 24 (citing Def. 56.1 ¶ 82)). Plaintiff objects,

maintaining that his respiratory issues are evidenced by his use of Claritin D,

and separately asserting that he has primary ciliary dyskinesia, or PCD, a

genetic issue affecting the cilia in his lungs. (*See* Pl. Opp. 28-29).

Plaintiff's objections are belied by his medical records, which indicate

that, while Plaintiff has situs inversus totalis, he does not have PCD, nor does

he have any other respiratory issues. (*See generally* Gilroy Decl., Ex. 5).[15]

Moreover, Plaintiff has provided no admissible evidence that his situs inversus

---

[15]    For example, the record from Plaintiff's August 24, 2019 doctor's visit — two days
before Plaintiff was terminated from Aetna-AHM — reports that: "[Plaintiff] is well-
developed, well-nourished, and in no cardiorespiratory distress." (Gilroy Decl., Ex. 5 at
28). The record further states, "Respiratory:  Lungs are clear to auscultation and
percussion.  No wheezes, rales, rubs or rhonchi are noted." (*Id.*). Finally, the
"Diagnosis" section does not include PCD, or any other respiratory condition. (*Id.*).

totalis "substantially limits one or more major life activities," as is required for a condition to be considered a disability. *Vitti* v. *Macy's Inc.*, No. 14 Civ. 5108 (RJS), 2017 WL 6405848, at *7 (S.D.N.Y. Sept. 29, 2017) (finding plaintiff cannot establish a disability where he "offers no admissible medical evidence of [his] alleged impairments"), *aff'd*, 758 F. App'x 153 (2d Cir. 2018) (summary order). Nor, for purposes of summary judgment, can the Court credit Plaintiff's bare testimony about the severity of his respiratory issues. *See id.* (finding "[plaintiff] cannot defeat a motion for summary judgment by relying … on her own unsubstantiated assertions about her difficulty breathing").

Ultimately, Plaintiff has failed to present evidence that, at the time of his work with Aetna-AHM, he had a respiratory impairment that would render him a person with a disability for his claims arising from dust in his office. Lacking this essential element of his *prima facie* case, it necessarily follows that Plaintiff cannot make out the remaining elements, as Defendants could not have had notice, nor accommodated, a disability that Plaintiff did not have. *Cf. Shaywitz* v. *Am. Bd. of Psychiatry & Neurology*, 848 F. Supp. 2d 460, 467 (S.D.N.Y. 2012) ("[The ADA's] requirement that private entities make 'reasonable accommodations' for disabled individuals would be rendered meaningless if the entity had no basis for knowing [i] what accommodations the examinee was seeking, and [ii] whether those accommodations were reasonable in light of the disability and the test."). In light of this finding, the Court grants summary judgment in favor of all Defendants as to Plaintiff's failure to accommodate claims.

**F.      Summary Judgment Is Warranted as to Plaintiff's Timely Payment Claims Under the FLSA and the NYLL**

Moving from discrimination to payment claims, Plaintiff alleges that his failure to receive the checks sent to him by APN violated the FLSA and the NYLL.  Defendants respond that summary judgment is appropriate, as the record demonstrates that (i) Plaintiff was an independent contractor, rather than an employee, and therefore outside the scope of the FLSA and the NYLL; and (ii) regardless of his employment status, Aetna-AHM and APN fulfilled their payment obligations under the terms of the PSA and the Contractor Agreement. (*See* CVS Br. 24-25; APN Br. 12-13, 22-23).  For the reasons that follow, the Court agrees with Defendants' latter argument that the undisputed material facts foreclose any failure to receive pay claim.  In light of this conclusion, the Court declines to weigh in on the issue of whether Plaintiff has established a qualifying employment relationship under the FLSA or the NYLL.[16]

---

[16]      The Court notes that, with respect to the relationship between Plaintiff and Aetna-AHM, a jury could well conclude that an employment relationship existed, given that the "economic realities" test used to determine such a relationship under the FLSA is overinclusive of the common-law agency test used to determine this status under Title VII. *See Frankel* v. *Bally, Inc.*, 987 F.2d 86, 89-90 (2d Cir. 1993) (comparing "the strict common law agency test" used in the context of Title VII with the broader "economic realities" test used for the FLSA (citing *Nationwide Mut. Ins. Co.* v. *Darden*, 503 U.S. 318 (1993)).  The same is true for the *Bynog* test used to determine employment status under the FLSA, which overlaps significantly with the "economic realities" test. *See Hart* v. *Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 924 (S.D.N.Y. 2013) ("[T]here appears to have never been a case in which a worker was held to be an employee for purposes of the FLSA but not the NYLL (or vice versa).");  *see generally Bynog* v. *Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198 (2003).

As to the relationship between Plaintiff and APN, the Court acknowledges that precedent exists for finding workers dispatched by a staffing agency to be employees of that agency, but finds those cases to be distinguishable from the instant case, where Plaintiff and APN's interactions were dictated by Aetna-AHM and the terms of the PSA between Aetna-AHM, such that APN exercised minimal control over Plaintiff, and only for a short, three-month period. *See, e.g., Brock* v. *Superior Care, Inc.*, 840 F.2d 1054, 1060 (2d Cir. 1988) (finding appreciable degree of control existed where staffing agency "unilaterally dictated" the temporary nurses' hourly wage, limited their

"The FLSA and the NYLL both guarantee compensation for all work engaged in by covered employees." *Chichinadze* v. *BG Bar Inc.*, 517 F. Supp. 3d 240, 253 (S.D.N.Y. 2021) (internal quotation marks omitted and alteration adopted).  While the FLSA does not statutorily "prescribe any particular payment schedule, courts have consistently interpreted Section 206(a) [of the FLSA] to include a prompt payment requirement."  *See Belizaire* v. *RAV Investigative & Sec. Servs. Ltd.*, 61 F. Supp. 3d 336, 353 (S.D.N.Y. 2014); *see also Rosenbaum* v. *Meir*, — F. Supp. 3d —, No. 20 Civ. 4520 (WFK), 2023 WL 2305960, at *5 (E.D.N.Y. Mar. 1, 2023) ("[T]he NYLL similarly requires that covered employees are paid 'in accordance with the agreed terms of employment' and the NYLL, as with the FLSA, similarly requires prompt payment of due wages." (quoting *Belizaire*, 61 F. Supp. 3d at 354)).

At the motion to dismiss stage, the Court accepted Plaintiff's allegations that Aetna-AHM and APN had not made payment in light of the fact that he had not received a paycheck.[17]  At summary judgment, however, Plaintiff's allegations are evaluated in light of the materials adduced during discovery.

---

working hours, and "supervised the nurses by monitoring their patient care notes and by visiting job sites"); *Xue* v. *Koenig*, No. 19 Civ. 7630 (NSR), 2022 WL 4279185, at *6 (S.D.N.Y. Sept. 14, 2022) (finding appreciable degree of control existed where staffing agency dictated the software programmer's initial hourly wage, set the terms of programmer's trial period with end client, retained the ability to unilaterally raise programmer's wage, and maintained a relationship with programmer that lasted approximately 12.5 years).  As the Court accepts that "APN has taken all feasible steps to fully compensate Plaintiff" (APN Br. 22 (citing Def. 56.1 ¶¶ 58-68)), and finds that summary judgment is warranted in APN's favor on that basis, it need not decide whether Plaintiff has demonstrated a qualifying employment relationship between Plaintiff and APN.

[17]     The Court also suggested that Plaintiff's allegations supported a minimum wage claim under the NYLL.  *See Karupaiyan I*, 2021 WL 4341132, at *29.  As the undisputed facts indicate that Plaintiff's $68 hourly rate exceeded the New York minimum wage, this claim must also be dismissed as to all Defendants.  (*See* Def. 56.1 ¶¶ 37, 59, 61, 63).

And here, the undisputed evidence put forward by Aetna-AHM and APN demonstrates that both entities had in fact made timely payment to Plaintiff, and that any failure to receive payment was due to Plaintiff's change of residence.

Starting with Aetna-AHM, the facts show that during his engagement, Plaintiff submitted seven timesheets for the work he performed for Aetna-AHM from June 17, 2019, through approximately July 31, 2019, each of which was subsequently approved by Kalyani.  (*See* Def. 56.1 ¶ 52; Kalyani Decl. ¶¶ 5-6). Several weeks after Plaintiff's termination, APN created timesheets for the period from August 1, 2019, to August 23, 2019, and for the two-week notice period thereafter, and submitted these timesheets to Aetna for approval.  See (Def. 56.1 ¶ 55).  These timesheets corresponded to Plaintiff's regular forty-hour workweek, and were approved by Kalyani.  (*See id.* ¶¶ 55-56).  In addition to the timesheets, Aetna-AHM issued payment to APN for the services performed by Plaintiff as set forth in the approved timesheets.  (*See id.* ¶ 57). Accordingly, Aetna-AHM complied with all of its contractual obligations with respect to Plaintiff's payment.

The record further discloses that, upon receipt of the timesheets, APN paid Plaintiff according to the terms of the Contractor Agreement, sending separate checks for June 2019, July 2019, August 2019, and the two-week notice period to the Cinder Road address that had been agreed upon by the parties.  Each check was subsequently returned, uncashed, to APN.  (*See* Def. 56.1 ¶¶ 59-64).

Here, Plaintiff relies on several of the same arguments he raised in the context of his discrimination claims, including his argument that Neela Pathak knew he had been evicted and sent the checks to his home anyway, knowing that he would not receive them.  (Pl. 56.1 ¶ 66).[18]  The Court reaches the same conclusion:  Plaintiff's testimony is "contradictory and incomplete" and insufficient to withstand the clear, undisputed record.  *Jeffreys*, 426 F.3d at 554.  That record demonstrates that Defendants made payments on time, as directed by the terms of the Contractor Agreement, and followed up with Plaintiff in a timely fashion to request an alternative method of payment when the checks were returned.  Plaintiff has not proffered any evidence of his response to APN's last email, suggesting that the onus of providing an alternative address for payment rested with him.

The undisputed facts also make clear that Aetna-AHM and APN properly tendered payment to Plaintiff, and there was no delayed payment that can support Plaintiff's claims under the FLSA or the NYLL.  While the Court is sympathetic to Plaintiff's housing and financial disruptions, the fact that Plaintiff no longer lived at the Cinder Road address specified in the Contractor Agreement is insufficient, in and of itself, to sustain a claim that APN did not make prompt payment.  Nor can the Court credit Plaintiff's self-serving testimony as to the reasons why APN's payment pursuant to the contractual

---

[18]   Nor could a reasonable juror credit Plaintiff's assertion that Neela Pathak should have allowed him to come into the office to pick up the checks, as neither the emails provided by Plaintiff nor his deposition testimony indicates that he requested such an arrangement from APN.  (*Compare* Pl. Decl. ¶ 31, *with* Pl. Decl., Ex. B, C, *and* Pl. Dep. 27:15-17).

terms should be viewed in a sinister light.  *See Jeffreys*, 426 F.3d at 554 ("To defeat summary judgment, therefore, nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" (quoting *Matsushita*, 475 U.S. at 586)).  Defendants have met their "difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the [P]laintiff's favor," and accordingly grants summary judgment in their favor as to Plaintiff's claims under the FLSA and the NYLL.  *Id.*

### G.   The Court Retains Jurisdiction over Plaintiff's Common-Law Battery Claim

Plaintiff's final remaining claim is one of common-law battery against Purvi Jhala and Robert Denner, arising from an alleged physical altercation that occurred during Plaintiff's termination on August 26, 2019.  Here, Defendants do not seek summary judgment, but rather request that the Court decline to exercise supplemental jurisdiction over the claim if all other claims against them are dismissed.  (*See* CVS Br. 2 n.2; APN Br. 23).  Because the Court has declined to grant summary judgment as to all of Plaintiff's federal claims, the Court will continue to exercise supplemental jurisdiction over the battery claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.  The claims that remain for trial include:  (i) the Title VII, Section 1981, NYSHRL, and NYCHRL claims against Aetna-AHM for race discrimination related to the circumstances of Plaintiff's termination; (ii) the Section 1981, NYSHRL, and NYCHRL claims against Kalyani for race discrimination related to the circumstances of Plaintiff's termination; (iii) the NYCHRL claims for hostile work environment against Aetna-AHM and Kalyani; and (iv) the common-law battery claim against Denner and Jhala for the alleged physical altercation on August 26, 2019.  All other claims, including Plaintiff's race discrimination claims under Title VII, Section 1981, the NYSHRL, and the NYCHRL for failure to receive payment; his age discrimination claims under the NYCHRL; his failure to accommodate claims under the ADA, the NYSHRL, and the NYCHRL; and his prompt payment claims under the FLSA and the NYLL, must be dismissed against all Defendants.

The parties are hereby ORDERED to appear for a conference in Courtroom 618 of the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York, 10007, on **Thursday, October 5, 2023**, at **4:00 p.m.** to schedule trial in this matter.

The Clerk of Court is directed to terminate the motions at docket

numbers 95 and 110.

SO ORDERED.

Dated:        September 1, 2023
                  New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge